300 S.E.2d 291

**STATE of West Virginia**

v.

**Hartzel Ray FOSTER.**

No. 15504.

Supreme Court of Appeals of
West Virginia.

Feb. 15, 1983.

LaVerne Sweeney, Grafton, Franklin D. Cleckley, Morgantown, for appellant.

Chauncey H. Browning, Atty. Gen., S. Clark Woodroe and Michael E. Froble, Asst. Attys. Gen., Charleston, for appellee.

NEELY, Justice:

Appellant Hartzel Ray Foster was convicted of first-degree murder, without a recommendation of mercy from the jury, on 28 March 1981 in the Circuit Court of Barbour County, West Virginia. Mr. Foster sought appeal from this conviction, and we restricted his appeal to the issue of whether the circuit court's circumscription of the defense's impeachment of prosecution witnesses denied the appellant a fair trial. We find that it did, and award Mr. Foster a new trial.

The incidents leading to the alleged murder began on the afternoon of 28 August 1978 when the appellant, Ray Foster, walked from Buddy Abbot's tavern along the Buckhannon River to a place known as "the grade." He was accompanied by an acquaintance, "Cowboy" Knight, and when he reached the grade he encountered John and Ganise Pisino, Billy Semmelman and Henry Flores. A certain amount of drinking went on at the grade, and the appellant and "Cowboy" got high by injecting themselves with cocaine.

The discussion turned to a cocaine deal that had gone sour, and the group determined to remedy the failed deal by visiting the couple they believed to have stolen the cocaine. The plan was to retrieve the cocaine, its worth in money, or a "Ramcharger" automobile supposed to have been put up as collateral. At this point John and Ganise Pisino lost interest in the proceedings and went home. Our appellant, along with "Cowboy," Henry and Billy, drove to the trailer in which the couple lived. Armed with pistols and a rifle, they approached the trailer. Henry, "Cowboy" and appellant entered the trailer where they found the sought-for couple, namely John Ruckman, who was also armed, and Arideth McHenry. Billy remained on the trailer

porch. The conversation inside became heated, and Billy became frightened at the tone events had assumed and ran off. Henry then took John Ruckman into a separate room in the trailer in order to continue to discuss the matter, and left "Cowboy" and our appellant watching Arideth. A volley of shots suddenly went off in the separate room, "Cowboy" and the appellant each shot once, and when the shooting stopped John Ruckman and Arideth McHenry lay dead, and Henry Flores fatally wounded.

When our appellant was arrested for the murder of Arideth McHenry, he admitted to shooting her, but claimed that he acted in self-defense—that Arideth had pulled a gun when the shooting started. The essential element of his defense, thus, was to put a gun in the hand of Arideth McHenry when she was killed. To do this, he had to impeach the testimony of "Cowboy," who testified that Arideth was unarmed when he and the appellant shot her.

I

Appellant contends that he sought to impeach "Cowboy's" testimony by showing that "Cowboy" had injected cocaine into himself prior to the shooting. As Professor McCormick indicates, "[a]bnormality .... is a standard ground of impeachment. One form of abnormality exists when one is under the influence of drugs .... If the witness was under the influence at the time of the happenings which he reports in his testimony ..., this condition is provable, on cross or by extrinsic evidence, to impeach." E. Cleary, *McCormick on Evidence* § 45, 2d ed., 1972.

We agree with the appellant's argument before this Court that "Cowboy" was subject to impeachment on the basis of his being under the influence of cocaine. However, this was not the thrust of the defense's cross-examination. As defense counsel's questions both in open court and during the vouching of the record indicate,[1]

---

1. The testimony elicited from "Cowboy" on this matter at trial went as follows:

DEFENSE: Okay, now prior to going to the trailer—that is the trailer that was the scene of

he was interested in whether appellant was using cocaine, and his questioning of "Cowboy" was for the purpose of ascertaining whether the drug appellant used was in fact cocaine. While the Court may have been overly strict in not permitting "Cow-

this shooting—was Ray using any drugs that you know of?

COWBOY: Yes sir.

DEFENSE: Could you tell me what he was using if you know?

PROSECUTOR: I object to that Your Honor, I don't think he would be qualified to testify what the drugs were.

THE COURT: Objection is sustained. He can describe—it's the same objection you made—he can describe what he saw.

DEFENSE: You use any of those drugs?

COWBOY: Yes sir.

DEFENSE: And with respect to your use of those drugs, have you used drugs before?

COWBOY: Yes.

DEFENSE: Was there any question in your mind what...

PROSECUTOR: Objection Your Honor, he is not a chemist. I don't believe he has been qualified as an expert.

THE COURT: Objection sustained.

DEFENSE: Not at this point, but later, Your Honor, we would like to vouch the record on that particular point your Honor.

THE COURT: Alright.

Later that same day the record was vouched out of the presence of the jury on the matter of the use of cocaine by appellant and "Cowboy." The record proceeds;

BY THE DEFENSE:

Q. You want to resume your seat up here Cowboy? Now Cowboy, I was asking you earlier in the testimony about Ray and you—are you familiar with cocaine? How long have you used cocaine prior to this occasion?

A. I have done it on and off maybe four years—maybe a little over.

Q. Okay. and with respect to the cocaine, have you bought and sold cocaine?

A. Bought mostly.

Q. Okay, you have sold some?

A. Yes sir.

Q. Were you pretty familiar with what it looked like—that is, as far as its appearance—to see it—how do you know if something is cocaine? What do you—how do you test to see if it's cocaine as far as you're concerned?

A. By putting it on your gums and tongue—the numbness.

Q. Okay, it produces some sort of numbing effect?

A. Yeah.

Q. And with respect to the cocaine that you were—using down at the grade—what effect did it produce? What did you feel like after you used it?

THE COURT: This is completely irrelevant and immaterial.

DEFENSE: I am vouching the record.

THE COURT: You are vouching the record for what took place after he put this stuff in his arm. The question is, could he tell at the time by putting it in his arm what it was.

DEFENSE: I think he might be able to tell from the effect—when you...

PROSECUTOR: Your Honor, the issue here is whether he knew Mr. Foster was taking cocaine. What he took and how he felt, I don't think is admissable. [sic]

DEFENSE: I am only vouching the record at this point, Your Honor.

THE COURT: Go ahead. I just don't want to stay here all lunch hour doing what's irrelevant and immaterial.

DEFENSE: I understand the Court's point. Now with respect to this cocaine—what effect did it produce on you? That is, the cocaine you were using at the grade?

A. Dizziness, you hear noises—I can't really describe it—its...

Q. Now this—were you about to say something else?

A. Yes, well, like when you do it, it's just like being—just like everything stops, you know, like I just don't know how to describe it.

Q. Okay now, with respect to this—is that the way cocaine normally effects you?

A. Yes sir.

Q. And at the grade, did this substance effect you in the same way? What I am trying to ask ...

A. I don't remember whether I done any at the grade or not. I don't remember. I knowed I done some before.

Q. You indicated earlier in testifying that you were doing some cocaine at the grade—are you changing that testimony now or not?

A. I just don't remember.

Q. Now, you indicated that Ray was doing some cocaine. How did you know Ray was doing some cocaine?

A. I saw him doing it.

Q. How did you know that what he was doing was in fact, cocaine?

A. It came out of the same bag where I got mine earlier.

Q. When you had it earlier, whose bag was it—your bag or his bag, or do you remember?

A. His bag.

Q. And when you did it earlier it was in your opinion, it was cocaine, was that right?

A. Yes sir.

Q. Okay, now the only other area I had Your Honor, that I needed to vouch the record was...

THE COURT: Mr. Mucklow, any questions?

PROSECUTOR: No Your Honor.

THE COURT: The Court is of the opinion this evidence is improper—he is not a professional—no evidence that he testified that this particular bag was cocaine—you may proceed with the next vouching of the record.

boy" to testify to this, it is not a basis for reversal.

 Most evidence is not *per se* either admissible or inadmissible; rather, it is admissible or inadmissible in relation to a theory or fact sought to be proved. Where evidence is arguably inadmissible as proof of one matter, yet is admissible as proof of another, it is not reversible error for a trial judge to refuse to admit the evidence if it is only offered in proof of the matter for whose proof it may be held inadmissible. The damage that the court's refusal to admit the evidence may have done to a possible impeachment of "Cowboy" on the basis of his own use of cocaine therefore cannot be asserted on appeal, since the evidence was not sought for this purpose at trial.

## II

A more troubling question is presented by the trial court's refusal to admit a letter written by "Cowboy" that contradicts his testimony and corroborates the testimony of the appellant. In the letter, "Cowboy" wrote:

> ... Wingler asked if Ardie (Arideth McHenry) had a gun, he stated, so Ardie didn't have a gun is that correct. If you will notice my answer was no. Woods was the one that told me to say that Ardie didn't have a gun. She had a small black gun, it was an automatic, I picked it up and gave it to Ray as we took Henry out of the trailer. I did not see her get the gun, I had my back turned to her when Ray yelled at me."

"Cowboy" never testified on direct or re-direct examination to whether the victim, Arideth McHenry, was armed. It was not until he was called as a rebuttal witness that "Cowboy" was asked to testify to this matter. At that point, for the first time, he said that the victim was unarmed. When the defense sought to impeach this testimony with the contradictory letter, the court sustained the prosecutor's objection to the letter's admission. There were statements in the letter that contradicted elements of "Cowboy's" direct and re-direct testimony, and the court ruled that the letter should

have been used to impeach the witness when he originally testified. Because the letter impeached elements of "Cowboy's" direct testimony, the court ruled, it could not be admitted during rebuttal.

After sustaining the prosecution's objection, the court called a recess. During the recess the court *sua sponte* suggested that "the witness could, by the admission of this letter be charged with another violation of the law." The court at once appointed an attorney for the witness, gave them a few minutes to talk privately, and then made the following statement: "I think it would be necessary for this witness to probably plead the Fifth Amendment on the basis he might incriminate himself and if counsel for the defendant, and counsel for the State would want to ask him questions with the advice of his counsel being present and he pleads the Fifth Amendment, then I think the court will be right in sustaining and finding that this letter is inadmissible."

These actions of the court below force us to reverse the jury verdict finding appellant guilty of this murder. While the letter may have been inadmissible during rebuttal for the purpose of impeaching "Cowboy's" testimony on direct examination, it was clearly admissible for the purpose of impeaching "Cowboy's" testimony on rebuttal, and it was offered explicitly for that purpose.

 A criminal defendant has a broad right to impeach prosecution witnesses on cross-examination with prior inconsistent statements. See *State v. Fellers*, 165 W.Va. 253, 267 S.E.2d 738 (1980); *State v. Wayne*, 162 W.Va. 41, 245 S.E.2d 838 (1978); *State v. Johnson*, 142 W.Va. 284, 95 S.E.2d 409 (1956). While the scope of cross-examination is generally within the discretion of the trial court and usually limited to matters brought out on direct, *U.S. v. Simpkins*, 505 F.2d 562 (4th Cir. 1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1327, 43 L.Ed.2d 424 (1975), the trial court may not control the scope of cross-examination so far as to prejudice the defendant. Furthermore, we are advised that "cross-examination to impeach is not, in general,

limited to matters brought out on the direct examination." *McCormick on Evidence, supra,* at 49. The right to an effective cross-examination is an integral part of the confrontation clause of the Sixth Amendment to the United States Constitution, *Snyder v. Coiner,* 510 F.2d 224 (4th Cir. 1975), and this right does not yield to a Rhadamanthine application of court rules governing order of proof.

■ We might conceivably agree with the court below were the contradiction of one insignificant piece of rebuttal testimony to open the door to an avalanche of evidence impeaching earlier direct testimony. Even then, however, giving a cautionary instruction, or limiting the admitted evidence to that contradicting the rebuttal testimony, very likely would suffice to protect the State's interests. In any event, the opposite is the case here: the single piece of evidence most damaging to appellant's claim of self-defense was the testimony of the sole eyewitness that the victim was unarmed when appellant shot her. To forbid the defense to enter into evidence a prior inconsistent statement of the prosecution's star witness on this very matter was to deny the appellant a fair trial.

The court's affirmative action in building for the prosecution Fifth Amendment barricades to protect the impeaching letter relieves us of any hesitancy we might otherwise have felt in requiring a new trial for the appellant. The Court aptly described the tone of the proceeding in its own words: "The only thing I am worrying about right now is protecting Mr. Knight's (the witness's) interests. Anything else I could care less about."

Appellant asserts assignments of error arising from other actions of the court below—overly restrictive rulings unnecessarily hampering the defense's ability to develop its theories, refusal to admit evidence that the prosecutor himself expressly approved of admitting—that confirm that the tone of the trial was not one of impartiality. It is unnecessary for us to address these claims. We consider the denial of the appellant's right to impeach the State's star witness on his most important piece of testimony sufficient to require that the appellant be granted a new trial.

Reversed and remanded.