701 S.E.2d 460

STATE of West Virginia, Plaintiff Below, Appellee

v.

Phillip BARNETT and Nathaniel Barnett, Defendants Below, Appellants.

No. 34806.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 27, 2010.

Decided July 13, 2010.

---

Daniel R. James, Esq., Nicholas T. James, Esq., The James Law Firm, PLLC, Keyser, WV, Attorneys for Appellants.

Darrell V. McGraw, Jr., Esq., Attorney General, R. Christopher Smith, Esq., Assistant Attorney General, Charleston, WV, Attorneys for Appellee.

PER CURIAM:

The appellants, Phillip Barnett and Nathaniel Barnett (hereinafter referred to as Appellants), appeal the orders of the Circuit Court of Cabell County, entered October 6, 2008, relating to their sentences arising from their convictions for murder of the second degree, in violation of W. Va Code § 61–2–1 (1991) (Repl.Vol.2005).[1] The lower court sentenced Phillip Barnett to 36 years' incarceration and Nathaniel Barnett to 40 years' imprisonment, with both receiving credit for time served prior to their convictions. Based upon the record, the parties' briefs and oral presentations to this Court, and for the reasons contained herein, we reverse the appellants' convictions and remand this case to the Circuit Court of Cabell County for a new trial.

---

1. W. Va.Code § 61–2–1 (1991) (Repl.Vol.2005) provides:

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [§§ 60A–4–401 et seq.], chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

## I.

### FACTUAL AND PROCEDURAL HISTORY

On August 8, 2002, the partially clothed body of 21–year–old Deanna Crawford was found in an unoccupied, abandoned barn-like structure along Hickory Ridge in Cabell County, West Virginia. The victim was found with no pants or undergarments on the lower half of her body and a tank-type top rolled up above her waist. The cause of Ms. Crawford's death was determined to be manual strangulation. Ms. Crawford was last seen alive on August 5, 2002. Investigating officers gathered physical evidence from the scene, including beer cans, cigarette butts, an elastic hairband and a pair of leopard-print pants last seen being worn by Ms. Crawford. None of the physical evidence, however, connected the death of Ms. Crawford to any suspects, including the appellants, and the investigation remained stalled. One of the original suspects upon whom the investigation focused died, and the investigation was at a standstill until January of 2007. At that time, law enforcement received information concerning an individual named Brian Dement, who was alleged to have talked with his uncle about participating in the death of Ms. Crawford. Unbeknownst to Dement, his uncle surreptitiously recorded a conversation between them in which Dement discussed details of the killing. Dement's statements to his uncle mentioned other individuals, including Justin Black[2] and the appellants, brothers Nathaniel Barnett and Phillip Barnett. Dement's uncle in turn presented this recording to law enforcement.[3]

On the basis of the recording provided by Dement's uncle, on January 28, 2007, law enforcement questioned Dement about his involvement, and that of other persons, in the death of Ms. Crawford. In a questioning session that lasted approximately nine hours, Dement signed two statements detailing the murder of Ms. Crawford. A third statement was tape-recorded by law enforcement. Each statement contained facts inconsistent with other versions. Dement implicated Justin Black and the appellants as participants in the murder, and in varying degrees, implicated himself as either a direct or indirect participant in the acts that caused Ms. Crawford's death. No arrest of the appellants was made at this time. However, the case was presented to the grand jury and an indictment was returned alleging that the appellants, Justin Black and Brian Dement committed the offense of first degree murder of Ms. Crawford.[4]

This indictment was filed on May 11, 2007. As a result of the indictment, an arrest warrant was issued by the circuit court on May 15, 2007, and both appellants were held in the Western Regional Jail pending their arraignment on May 31, 2007. The appellants were placed on bond with certain terms and conditions, including home confinement.

■ The State of West Virginia elected to try Dement first.[5] Prior to the date set for his trial to begin, Dement entered into a plea agreement with the State. On October 23, 2007, Dement entered a plea of guilty to second degree murder and a Kennedy[6] plea to the malicious wounding of his girlfriend.

---

**2.** The facts and circumstances of Justin Black's trial were fully reviewed and discussed in the related case of State v. Black, —— W.Va. ——, —— S.E.2d —— (2010).

**3.** Dement's uncle was known to law enforcement and had previous convictions.

**4.** The indictment also contained a second count that charged Brian Dement with the malicious wounding of Brittany Mayo Wolfe on or about January 27 or 28, 2007.

**5.** The cases of co-defendants Dement, Black and the appellants were assigned to and heard by the same judge.

**6.** A Kennedy plea refers to the ability of a person charged with a crime to agree to a particular sentence for the crime without admitting his or her direct participation. The plea signifies consent to the benefits of proceeding without a trial. Reference is made to the case of Kennedy v. Frazier, 178 W.Va. 10, 357 S.E.2d 43 (1987), and particularly Syllabus Point 1 of this case, in which we stated:

> An accused may voluntarily, knowingly and understandingly consent to the imposition of a prison sentence even though he is unwilling to admit participation in the crime, if he intelligently concludes that his interests require a guilty plea and the record supports the conclusion that a jury could convict him.

As part of his plea agreement, Dement was required to give truthful testimony in the upcoming trials of co-defendants Black and the appellants. Dement's plea agreement contained the State's recommendation of a prison sentence of between 20 to 24 years. Dement was ultimately sentenced to 30 years' imprisonment.

The State next proceeded against co-defendant Black, whose trial began in February, 2008. That trial ended prior to its conclusion when a mistrial was declared. On April 15, 2008, Black's second trial began. Dement provided trial testimony in Black's case and was questioned about the prior inconsistent statements he gave to law enforcement, as well as recorded statements given by him to a private investigator, Greg Cook. The investigator was working for the appellant Nathaniel Barnett. This recorded statement was taken while Dement was incarcerated in the Western Regional Jail on October 25, 2007, and after Dement had entered his plea of guilty to second-degree murder on October 23, 2007. In this statement, Dement indicated that he had been trying to "go against my statement" but was not allowed to do so by his lawyers and the judge. Dement also indicated that "they [law enforcement] came to my house—came to my house without my permission, put handcuffs on me, put guns to my head." The investigator pointed out the inconsistencies between what Dement had said in court two days earlier at his plea hearing, as well as what Dement had said to him that day. Dement repeatedly noted that "we all are innocent," meaning himself, the appellants and Justin Black. He denied being with the other co-defendants on the evening the crime was alleged to have been committed. As the conversation continued, Dement admitted that he had not told the truth to law enforcement, the court, probation officers or his attorneys.

In Black's trial, the circuit court allowed defense counsel the opportunity to extensively cross-examine Dement about these inconsistent statements. The jury was played two prior inconsistent statements, the above-referenced October 25, 2007, conversation with investigator Greg Cook, and a later statement in March, 2008, also given to a private investigator for the appellants. Black was convicted of second degree murder and on July 2, 2008, was sentenced to 40 years' imprisonment. Black's conviction and sentence were subsequently appealed to this Court and affirmed.[7]

The trials of both Nathaniel Barnett and Phillip Barnett were initially scheduled for September 4, 2007.[8] Prior to the scheduled trial date, both Nathaniel Barnett and Phillip Barnett moved for trials within the term of their indictment. Despite the appellants' objections, the trial date was continued from September of 2007 to February 19, 2008. The appellants' trial was further delayed at the State's request[9] and finally commenced on August 25, 2008. A verdict was reached on August 27, 2008, in which the appellants were convicted of the lesser-included offense of second degree murder. As was the case with Black's trial, the trial of the appellants centered on the testimony of Brian Dement. When Dement appeared to testify, it was noted by counsel for the State and the appellants that Dement's testimony was required under the terms of his plea agreement. No cautionary instruction or direction to the jury was requested by the appellants' counsel or the State, and the lower court did not of its own volition instruct the jury on the issue of a co-defendant's guilty plea to the same indictment being tried.[10] Dement testified that

7. *See* footnote 2.

8. At the beginning of these proceedings the circuit court *sua sponte* ordered that the trials of the four co-defendants be severed. The appellants later moved for, and were granted by order entered March 11, 2008, a joint trial.

9. On November 27, 2007, and on April 15, 2008, the lower court heard the motions for continuance of the appellants' trial dates. The circuit court found that the State had shown good cause

for the continuance of the trial dates, and that the State had the right to decide whom to try first among Dement, Black and the appellants.

10. That failure on behalf of the lower court to give a limiting instruction regarding accomplice testimony has been held to constitute reversible error. In Syl. Pt. 3 of *State v. Caudill*, 170 W.Va. 74, 289 S.E.2d 748 (1982), we held:

In a criminal trial an accomplice may testify as a witness on behalf of the State to having entered a plea of guilty to the crime charged

in August of 2002, after he had worked all day, Nathan Barnett came by his house to invite him to a party at the home of Justin Black's mother. Dement walked with Nathan Barnett to this party. When Dement arrived at the party, there were approximately 10 or more people there, and he knew several of them. Phillip Barnett was not present when Dement first arrived at the party. The night's activities included drinking, talking and playing video games in Black's bedroom.

At some point in the evening, Phillip Barnett and Black asked Dement if he wanted to go for a ride. Dement agreed and went to a dark-colored, four-door car. Dement testified he got into the back seat and waited for the others to join him. After several minutes, Black, the appellants and the victim, Ms. Crawford, got into the car. Ms. Crawford was seated in the passenger seat of the car. Black was the driver. The appellants and Dement were in the back seat of the vehicle. Dement testified that they traveled approximately two miles away from Route 10, talking, laughing and smoking marijuana. Suddenly, the appellant Phillip Barnett struck Ms. Crawford, and Black stopped the car near what Dement described as an abandoned farm on the backside of Hickory Ridge. Dement was familiar with the location and described it as an "old party spot." The location was also near where Dement was residing with his stepfather.

After Ms. Crawford was struck by Phillip Barnett, Dement stated that everyone decided "to get this b*tch" and he got out of the car and grabbed the victim by the neck. He stated that he "got out of the car, went to the passenger side and grabbed her out by her throat." When asked why he did this, Dement replied that "it was just a reaction." He then dragged her down into the woods, striking her along the way. Dement said he continued to drag her for some distance, laid her down and left. Dement testified that Black and the appellants followed him, continuing to hit and kick Ms. Crawford. Dement stated that he then left the area, going

back to the other side of the car, along the roadway where he claimed to have hidden in some weeds, because he did not want to participate any further in what the others were doing. While he was hiding in the vegetation, Dement heard the victim imploring and screaming at the assailants to stop, and later making moaning noises. Eventually the noises stopped and Black and the appellants returned to the car and drove off, leaving Dement behind. Dement came out from his hiding spot and proceeded to go look for Ms. Crawford. The location of Ms. Crawford was not where he had last seen her, and he continued to a shed, where he found her on her back in a curled position. He did not recall that she was not clothed at the time. Dement testified that he checked her neck for a pulse, and finding none, he left. He walked to Morrison's Market and called a cab to return to his home. He did not speak to the appellants or Black again that night.

Dement was questioned by the State regarding prior inconsistent statements given to law enforcement. He admitted that in one of these statements, he minimized his role in the beating of the victim. Dement admitted that in the second statement, he was not telling the truth but that "he told more of the truth" at that time. One of the statements made by Dement was introduced into evidence. Dement also testified about giving a third statement to law enforcement, this one being tape-recorded. Dement acknowledged that there were other statements that he had made about Ms. Crawford's death, including two made to investigators for his co-defendants.

While being cross-examined by counsel for appellant Phillip Barnett, Dement admitted that he had told investigator Greg Cook that none of these events took place. He stated that what he told the investigator was not true, as well as what he told counsel for Justin Black. He admitted that there were inconsistencies between all of his statements, but that he was telling the truth in these

---

against a defendant where such testimony is not for the purpose of proving the guilt of the defendant and is relevant to the issue of the witness-accomplice's credibility. The failure

by a trial judge to give a jury instruction so limiting such testimony is, however, reversible error.

proceedings. Counsel sought, in an off-the-record discussion with the court, the opportunity to fully present the inconsistencies and differences between the testimony of Dement on the stand and the myriad of differing statements made to police and to the private investigators. Counsel intended to present to the jury the entirety of the exculpatory statement made by Dement to the private investigators. The circuit court refused to allow the recorded statement to be played to the jury, ruling that because Dement admitted that he lied, there was no need to further document the lies. The colloquy between the court and counsel went as follows:

> THE COURT: Anything else that you wanted—was this what you wanted to put on the record?
>
> STATE: Do you want to raise the other issue?
>
> DEFENSE: Judge, in response to your question, there had been indications that we—the defense wanted to continue to impeach Mr. Dement with the recorded statement taken by Mr. Greg Cook out at the jail. And in an off-the-record discussion, Your Honor had indicated that it would not be permitted due to the admissions already made by Mr. Dement. And I wanted to place that—
>
> THE COURT: Put that in opposition?
>
> DEFENSE: Yes.
>
> THE COURT: And the Court—and that was during the discussion we had where the Court was informed in chambers that Mr. Black would take the 5th Amendment based upon, I guess, an appeal still running. I would honor that. And therefore, he could not be called just to take the 5th and give an unjust inference in front of the jury. And I did rule that once Mr. Dement admitted that he lied in those things, and he definitely admitted he lied. The impeachment evidence you had of playing the recording was improper to be played, because it was not an issue that he lied. So your matter is on the record.

Other witnesses presented by the State included investigating law enforcement officials, the medical examiner and three witnesses whose testimony tended to show that the appellants and Justin Black were at a party together in the late summer of 2002 and left together at some point. One of these witnesses stated that Brian Dement and Deanna Crawford were not at this party but Black and the appellants were; the other witness saw Deanna Crawford at some time in the summer of 2002 walking along Hickory Ridge near the house of Black's mother. One witness could place the appellants, Justin Black, Brian Dement and Deanna Crawford at a party together in late summer of 2002 at the home of Black's mother along Hickory Ridge. The direct connection between the appellants, Dement and Black was not made until Dement's statements.

On August 27, 2008, the jury returned a unanimous verdict of guilty finding both appellants guilty of the lesser-included offense of second degree murder. By an order entered October 6, 2008, Phillip Barnett was sentenced to 40 years in the state penitentiary and Nathaniel Barnett was sentenced to 36 years in the penitentiary. The appeal of this order followed.

## II.

### STANDARD OF REVIEW

In this appeal the appellants raise five assignments of error. Appellants contend that: 1) the trial court committed reversible error by not allowing the state's chief witness to be confronted with prior inconsistent statements, including one which allegedly exonerated the appellants; 2) the trial court failed to instruct the jury on the effect of the co-defendant's testimony relative to his second-degree murder conviction pursuant to a plea bargain agreement; 3) the trial court committed reversible error by not removing a juror for cause; 4) the court committed reversible error by limiting each appellant to three peremptory challenges and 5) the lower court violated the one-term rule, denying the appellants their constitutional right to a speedy trial.

In *State v. Blake,* 197 W.Va. 700, 478 S.E.2d 550 (1996) we enunciated a standard of review as follows:

A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are reviewed for an abuse of discretion. See *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995). Even when a trial court has abused its discretion by admitting or excluding evidence, the conviction must be affirmed unless a defendant can meet his or her burden of demonstrating that substantial rights were affected by the error. See *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996). In other words, a conviction should not be reversed if we conclude the error was harmless or "unimportant in relation to everything else the jury considered on the issue in question." *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432, 449 (1991). Instead, this Court will only overturn a conviction on evidentiary grounds if the error had a substantial influence over the jury. This reasoning suggests that when the evidence of guilt is overwhelming and a defendant is allowed to put on a defense, even if not quite so complete a defense as he or she might reasonably desire, usually this Court will find the error harmless. If, however, the error precludes or impairs the presentation of a defendant's best means of a defense, we will usually find the error had a substantial and injurious effect on the jury. When the harmlessness of the error is in grave doubt, relief must be granted. *O'Neal v. McAninch*, 513 U.S. 432, 438, 115 S.Ct. 992, 996, 130 L.Ed.2d 947, 955 (1995); *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

*Id.*, 197 W.Va. at 705, 478 S.E.2d at 555.

With these standards in mind, we turn to our review of the facts as they apply to the law.

# III.

## DISCUSSION

In this appeal the appellants raise five assignments of error. Appellants contend that: 1) the trial court committed reversible error by not allowing the state's chief witness to be confronted with prior inconsistent statements, including one which allegedly exonerated the appellants; 2) the trial court failed to instruct the jury on the effect of the co-defendant's testimony relative to his second-degree murder conviction pursuant to a plea bargain agreement; 3) the trial court committed reversible error by not removing a juror for cause; 4) the court committed reversible error by limiting each appellant to three peremptory challenges and 5) the lower court violated the one-term rule, denying the appellants their constitutional right to a speedy trial. At the oral argument of this case, counsel for the appellants abandoned the assignments of error related to jury selection and challenges, as well as the right to a speedy trial. Because of our resolution of this case on other grounds, we need not address the lack of a cautionary instruction to the jury regarding the co-defendant and alleged accomplice's testimony.[11] We focus on the admissibility of the prior inconsistent statements of Brian Dement given to the appellants' private investigator.

As noted herein, the appellants attempted at trial to impeach witness Dement's testimony by seeking to admit two prior inconsistent statements given to investigator Greg Cook. The circuit court's denial of this request, despite allowing impeachment through questioning, was based upon the witness' admissions that he had been untruthful in prior statements. The lower court appears to have concluded that since the witness had already admitted his lack of candor to au-

---

**11.** As noted previously, no cautionary instruction was given to the jury pursuant to *State v. Caudill*, *supra*, regarding the testimony of Brian Dement, the appellants' co-defendant who entered into a plea agreement with the State. *See* footnote 10.

The State contends that because the required instruction was not requested, and no objection was made, the appellants waived any error. Alternatively, the State contends that any error was harmless. The appellants posit that our holding

in *Caudill* makes the instruction to the jury mandatory, despite the lack of an objection to the lower's court's failure to give the appropriate instruction. We observe that our holding in *Caudill* would appear to require the trial court to give such an instruction. Because of our resolution of this appeal on the cross-examination issue, it is not necessary for us to now consider whether the trial court's failure to give such an instruction was plain error.

thorities and investigators, admission of the actual statement containing the inconsistencies was unnecessary. We must first consider whether the statements were admissible and whether the lower court's denial to admit the same constituted an abuse of discretion.

■ This Court has stated that "[a] defendant on trial has the right to be accorded a full and fair opportunity to fully examine and cross-examine the witnesses." Syl. Pt. 1, *State v. Crockett,* 164 W.Va. 435, 265 S.E.2d 268 (1979). As we noted in *State v. Graham,* 208 W.Va. 463, 541 S.E.2d 341 (2000), this right is not unbridled and is subject to general rules, as we have previously defined as follows:

> Several basic rules exist as to cross-examination of a witness. The first is that the scope of cross-examination is co-extensive with, and limited by, the material evidence given on direct examination. The second is that a witness may also be cross-examined about matters affecting his credibility. The term "credibility" includes the interest and bias of the witness, inconsistent statements made by the witness and to a certain extent the witness' character. The third rule is that the trial judge has discretion as to the extent of cross-examination.

Syl. Pt. 4, *State v. Richey,* 171 W.Va. 342, 298 S.E.2d 879 (1982).

■ The trial court's decision must be balanced with the substantive rights of the appellants. This balance in the court's role in governing cross-examination was explained by Justice Cleckley in *Blake, supra,* who opined "[l]atitude normally is permitted in cross-examining the State's witnesses, and limitation of such cross-examination may only be based upon sound reasons justifying a departure from the norm." *Id.* at 709, 478 S.E.2d at 559.

■ If "[c]ross-examination is the engine of truth," cross-examination in the interest of substantial justice seeking to elicit relevant truths should not be narrowly construed. *Blake,* at 710, 478 S.E.2d at 560, citing *State v. Thomas,* 187 W.Va. 686, 691, 421 S.E.2d 227, 232 (1992). As was the case in *Blake,* we believe that the evaluation of any abuse of discretion by the lower court

as it relates to the cross-examination of the State's witnesses, particularly where a witness is the chief or sole witness providing testimony against a defendant, must include a review of whether there was sufficient other information upon which the jury could have based its decision. Here, the impeaching statements which appellants sought to introduce went not only to the general credibility of Brian Dement for truthfulness, but also to specific aspects of the actual murder of Ms. Crawford, including who did—and, by implication, who did not—do what. Dement was the State's sole witness to testify at trial who could place the appellants at Ms. Crawford's murder. Alternative accounts by Dement as to how the murder occurred, including who was present, are important not simply to challenge the credibility of Dement for truthfulness, but also to allow the jury to specifically consider and weigh each of the versions which Dement has asserted.

■ *Blake* also stands for the very important premise regarding what steps the court must take in determining whether a prior inconsistent statement should be admissible. In *Blake* we held:

> Three requirements must be satisfied before admission at trial of a prior inconsistent statement allegedly made by a witness: (1) The statement actually must be inconsistent, but there is no requirement that the statement be diametrically opposed; (2) if the statement comes in the form of extrinsic evidence as opposed to oral cross-examination of the witness to be impeached, the area of impeachment must pertain to a matter of sufficient relevancy and the explicit requirements of Rule 613(b) of the West Virginia Rules of Evidence—notice and an opportunity to explain or deny—must be met; and, finally, (3) the jury must be instructed that the evidence is admissible only to impeach the witness and not as evidence of a material fact.

Syl. Pt. 1, *Blake, supra.*

■ In applying the Blake factors to the prior inconsistent statements that the appellants sought to introduce, we must first determine whether the prior inconsistent

statements were indeed inconsistent. Unlike Dement's trial testimony, where the witness gave a detailed recitation of the appellants' presence and participation in the murder of Ms. Crawford, the statements proclaim the innocence of each appellant. It is not a matter of examining the minutia of each statement for minor variances; the difference between the trial testimony and these statements is vast. The first prong of the Blake test is met.

Having found that the statements are inconsistent, and since the inconsistencies that the appellants sought to develop came in the form of extrinsic evidence and not merely through oral examination of Dement, under Blake the next question to be resolved is whether area of impeachment is relevant, and whether the evidence comports with the requirements of Rule 613 of the Rules of Evidence.[12] The lower court's ruling does not appear to question the relevancy of these statements; rather, the hesitancy to admit these statements appears to turn upon whether it was necessary to document that inconsistencies that the witness fully admitted. Furthermore, the witness was actively testifying and was present, and would have been in a position to explain or deny the various inconsistencies, satisfying Rule 613(b)'s requirements. The second prong of the Blake test is satisfied.

■ Finally, Blake requires that when admitting the prior inconsistent statements of a witness, an instruction be read to the jury to advise them that the evidence is admissible only for the purpose of impeachment, as opposed to being admitted as evidence of a material fact.

As noted in the recitation of the facts, the discussion between the court and counsel regarding the admission of the prior inconsistent statement of Dement occurred outside of the official court record. We glean, however, from the reservation of error by appellants' counsel, that the lower court believed that once Dement had acknowledged his inconsistent statements, and once the court ruled that Dement had in fact lied, it was not necessary to place the actual statement before the jury. We acknowledged a similar issue in *State v. King*, 183 W.Va. 440, 396 S.E.2d 402 (1990). In *King*, we affirmed the admission of a trooper's videotaped interview with a defense witness (the defendant's daughter), as a prior inconsistent statement, where the child testified that she had previously lied about her father having sex with her. On appeal, the admissibility of that prior inconsistent statement was reviewed.

■ We note the similarity between the videotaped evidence introduced in *King*, and the audiotaped evidence sought to be introduced by the appellants herein. Both types of recordings allow the jury to examine and assess voice inflection and other auditory factors bearing on credibility, with the videotaped evidence providing additional opportunities for visual observations. The precautions in *King* relating to the admissibility of videotaped evidence are worth noting:

"A videotaped interview containing a prior inconsistent statement of a witness who claims to have been under duress when making such statement or coerced into making such statement or coerced into making such statement is admissible into evidence if: (1) the contents thereon will assist the jury in deciding the witness' credibility with respected to whether the witness was under duress when making such statement; (2) the trial court instructs the jury that the videotaped interview is to be considered only for purposes of deciding the witness' credibility on the issue of duress or coercion and not as

**12.** West Virginia Rules of Evidence Rule 613. Prior Statements of Witnesses

(a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

substantive evidence; and (3) the probative value of the videotaped interview is not outweighed by the danger of unfair prejudice."

Syllabus Point 2, *State v. King*, 183 W.Va. 440, 396 S.E.2d 402 (1990).

We also noted in *King*

Clearly, this case presents an instance where a witness' prior inconsistent statements do possess a unique advantage over her testimony during the trial in that it allowed the jury to decide the issue of the witness' credibility on two occasions, both of which the jury was able to observe.

*Id.*, 183 W.Va. at 446, 396 S.E.2d at 409.

The Court acknowledged in *King,* the split of authority regarding whether a prior inconsistent statement is admissible if the witness has acknowledged inconsistencies. Thus, the Court recognized as follows:

It is often held that "[i]f a witness unequivocally admits the inconsistencies in a prior statement before extrinsic evidence of the statement has been offered, the extrinsic evidence will usually be excluded as cumulative and unnecessary." 2 G. Joseph & S. Saltzburg, Evidence in America § 47.3, at 4–5 (1987). *See State v. Johnson,* 220 Neb. 392, 401, 370 N.W.2d 136, 142 (1985); F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4.2(b), at 161, 163 (2d ed.1986); *McCormick on Evidence* § 37, at 79 (E. Cleary 3d ed.1984); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* para. 613, at 613–3 (1988).

On the other hand, it has been recognized that "[e]ven where the witness admits having made the other statements, this does not prevent the opponent from offering it in evidence by his own witnesses[.]" 3A J. Wigmore, *Evidence in Trials at Common Law* § 1037 (J. Chadbourn rev. ed. 1970 & Supp.1990) (emphasis in original).

These two differing views on whether extrinsic evidence is admissible where the witness has admitted making the prior inconsistent statement have emerged and have been discussed by many authorities. Leading these views are Professors McCormick and Wigmore. Professor McCormick contends that extrinsic evidence in such circumstances should be inadmissible. Professor Wigmore, however, maintains that such evidence should be admissible.

*King,* 183 W.Va. at 444–45, 396 S.E.2d at 406–07.

The Court, in *King,* while acknowledging the split of authority, did not definitively resolve the issue. Rather, the Court determined that in *King,* the admission of the prior inconsistent statement was not erroneous. The Court also noted that that "[o]ften, a prior inconsistent statement will have an advantage over trial testimony." *Id.*, 183 W.Va. at 446, 396 S.E.2d at 408.

We have addressed the use of a witness' prior inconsistent statement in the form of a letter in the case of *State v. Foster,* 171 W.Va. 479, 300 S.E.2d 291 (1983). In that case, a rebuttal witness was asked whether the victim of a murder was armed or unarmed. His answer was contradicted by a letter he had previously written. The trial court refused to allow admission of this letter for impeachment purposes. We determined that the lower court erred in refusing to admit the letter, opining:

A criminal defendant has a broad right to impeach prosecution witnesses on cross-examination with prior inconsistent statements. *See State v. Fellers,* 165 W.Va. 253, 267 S.E.2d 738 (1980); *State v. Wayne,* 162 W.Va. 41, 245 S.E.2d 838 (1978); *State v. Johnson,* 142 W.Va. 284, 95 S.E.2d 409 (1956). While the scope of cross-examination is generally within the discretion of the trial court and usually limited to matters brought out on direct, *U.S. v. Simpkins,* 505 F.2d 562 (4th Cir. 1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1327, 43 L.Ed.2d 424 (1975), the trial court may not control the scope of cross-examination so far as to prejudice the defendant. Furthermore, we are advised that "cross-examination to impeach is not, in general, limited to matters brought out on the direct examination." *McCormick on Evidence,* supra, at 49. The right to an effective cross-examination is an integral part of the confrontation clause of the Sixth

Amendment to the United States Constitution, *Snyder v. Coiner,* 510 F.2d 224 (4th Cir.1975), and this right does not yield to a Rhadamanthine application of court rules governing order of proof.

*Foster,* 171 W.Va. at 482–83, 300 S.E.2d at 294–95.

In summary, and with the satisfaction of the Blake factors having been attained, and noting that the evidence sought to be introduced by the appellants was of value to the jury in assessing the credibility of the state's key witness, we conclude that the lower court abused its discretion by excluding the prior inconsistent statements of the State's key witness Brian Dement. Under the facts and circumstances of this case as presented on this appeal,[13] we find that the circuit court's refusal to allow the presentation of the actual inconsistent statements was an abuse of discretion and warrants a reversal of the appellants' convictions and a remand for a new trial.

## IV.

## CONCLUSION

For the foregoing reasons, we reverse the conviction of the appellants, Nathaniel Barnett and Phillip Barnett, and remand this case for a new trial.

**Reversed and remanded.**

---

13. We observe that, on retrial, the State may not be as limited in the presentation of its case in chief as it was below. Since the appellants' trial, the appeal of alleged co-defendant, Justin Black, has been considered by this Court. Mr. Black's conviction was affirmed. *See* footnote 2.