# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Respondent**

**vs.) No. 18-0406** (Marion County 17-F-77)

**Oscar Chapman,**
**Petitioner**

**FILED**
**April 24, 2020**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Following a jury trial, Petitioner Oscar Chapman ("Defendant Chapman") was convicted of first-degree murder, conspiracy to commit a felony, first-degree robbery, and nighttime burglary. By order entered on April 16, 2018, the circuit court denied his motion for a new trial. The circuit court sentenced Defendant Chapman on all four counts, including a sentence of life, with mercy, for his murder conviction. On appeal, Defendant Chapman asserts that the circuit court erred by denying him the opportunity to impeach two State witnesses with prior inconsistent statements. The State confesses error on this issue and concedes that the error was not harmless.[1]

After review, we agree with Defendant Chapman and the State that the circuit court erred by denying Defendant Chapman the opportunity to impeach two witnesses with prior inconsistent statements and find that this error was not harmless. We reverse Defendant Chapman's convictions and remand this matter to the circuit court for a new trial. This case satisfies the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure and is appropriate for disposition in a memorandum decision.

On November 17, 2016, three men entered Malcolm Whitted's ("victim") apartment in Fairmont, West Virginia. The three men were armed and planned to rob the victim of drugs and money. During the robbery, the victim was shot three times and died. The State Medical Examiner opined that the victim's cause of death was multiple gunshot wounds and that the manner of death was homicide.

---

[1] Defendant Chapman is represented by Neal Jay Hamilton, Esq. The State is represented by Attorney General Patrick Morrisey, Esq., and Assistant Attorney General Scott E. Johnson, Esq.

Defendant Chapman did not enter the victim's apartment on the night of the robbery. However, according to the State, Defendant Chapman was involved in planning the crime and rode to the victim's apartment with the three men on the night of the robbery. The State asserted that Defendant Chapman remained in the vehicle, with a firearm, while the robbery and shooting occurred. Defendant Chapman was indicted on four counts: first-degree murder in violation of W. Va. Code § 61-2-1, conspiracy to commit a felony in violation of W. Va. Code § 61-10-31, first-degree robbery (with a firearm) in violation of W. Va. Code § 61-2-12(a)(1), and nighttime burglary in violation of W. Va. Code § 61-3-11(a).

Defendant Chapman's jury trial took place in January of 2018. The State's primary witnesses were Timothy Lambert ("Mr. Lambert"), one of the armed men who took part in the crime, and Robert Antwann Jarvis ("Mr. Jarvis"), a confidential informant who provided information about the crime to the police shortly after it occurred. As noted by the State in their brief to this Court, Lieutenant Douglas Yost of the Fairmont Police Department ("Lt. Yost") testified that no physical evidence linked Defendant Chapman to the crime scene, no DNA placed him at the victim's residence, no videotape identified him as an occupant of the vehicle involved in the crime, nor were Defendant Chapman's fingerprints on any item of the State's evidence. Thus, the testimony of Mr. Lambert and Mr. Jarvis was crucial to the State's case against Defendant Chapman.

Mr. Lambert entered a plea agreement with the State in which he pled guilty to first-degree robbery, conspiracy, and delivery of a controlled substance and received a thirty-year sentence. As part of his plea agreement, Mr. Lambert agreed to testify for the State in Defendant Chapman's trial.

Mr. Lambert testified that on the day of the robbery, November 17, 2016, he was with Defendant Chapman, Michelle Belton, Jay (he did not know Jay's last name), and Vanny Clay ("Mr. Clay"). This gathering was at Mr. Clay's residence and the group began discussing robbing the victim of money and drugs.[2] Mr. Lambert stated that "there was talk around the house about it [the robbery], and [Defendant] Chapman brought it up first." Mr. Clay then made a phone call trying to locate firearms. Eventually, Mr. Clay, Jay, and Defendant Chapman left the house and returned with two rifles and a pistol, and were accompanied by a man named Devon. Mr. Lambert explained that the plan to gain access to the victim's apartment arose from an incident that had occurred two days before the robbery. He testified that he and Defendant Chapman were at the victim's apartment purchasing drugs two days prior to the robbery. After buying the drugs, Mr. Lambert wanted to reenter the apartment, assault the occupants, and rob them. However, Defendant

---

[2] Mr. Lambert would later testify, during his direct examination, that the plan to rob the victim began "a couple of weeks" before November 17. He stated that a group including himself and Defendant Chapman discussed how the victim's apartment was being used for drug activity and that there was "a suitcase of money there."

2

Chapman did not agree with this plan and the two men, Mr. Lambert and Defendant Chapman, got into a fight on the victim's porch. Mr. Lambert stated that he lost his hat and a necklace during this fight. On the night of the robbery, Mr. Lambert called the victim's apartment and informed the occupants that he would be returning to retrieve his hat and necklace.

Mr. Lambert testified that he, Defendant Chapman, Mr. Clay, Jay, and Devon got into a black GMC Jimmy and drove to the victim's apartment. Mr. Lambert and Devon were armed with rifles, while Jay and Defendant Chapman had pistols. When the group arrived at the victim's apartment, Mr. Lambert stated that Defendant Chapman got out of the backseat of the car and then got into the front passenger side of the car. Mr. Lambert also testified that Defendant Chapman said something to Devon which Mr. Lambert could not hear.

The plan, according to Mr. Lambert, was for Mr. Clay and Defendant Chapman to circle the block in the car while the other three men entered the apartment and committed the robbery. The three men gained entry to the victim's apartment and ordered the occupants to give them their money. Mr. Lambert heard a gunshot and saw "Devon with his rifle up, and I seen bullets flying and like the percussion coming off the guns, so I knew he [Devon] was the one that fired first." The victim was struck by these gunshots. As the victim had blood coming out of his mouth and was gasping for air, Mr. Lambert stated that he told the victim he was sorry, and that the victim handed him the drugs and money. When Mr. Lambert exited the apartment, he stated everyone was gone. Defendant Chapman and Mr. Clay were not outside in the car waiting for him. Mr. Lambert stated that he went to his friend Renee's house and did drugs for about twenty minutes. He then got a ride back to Mr. Clay's residence.

Mr. Lambert testified that after returning to Mr. Clay's residence, Defendant Chapman told him they were going to Parkersburg. Mr. Lambert accompanied Defendant Chapman and Mr. Clay on their trip to Parkersburg. While in Parkersburg, Mr. Lambert posted a Facebook message apologizing for what happened to the victim which angered Mr. Clay and Defendant Chapman. Mr. Lambert testified that Defendant Chapman "actually said I had 24 hours . . . if they didn't decide whether I was going to stay with him or not, like if I was going to rat or not, I guess, that I would [be] killed within 24 hours." When he had the opportunity to get away, Mr. Lambert left Parkersburg and decided to turn himself in to the police.

Prior to his arrest, Mr. Lambert called Lt. Yost three times. All three calls were recorded. After he turned himself in, Mr. Lambert gave an audio-recorded statement to the Fairmont Police. When asked if he had told the police the truth in these prior statements, Mr. Lambert testified, "Yes, sir. I have from the beginning." Similarly, he was asked if his trial testimony was truthful, and he replied, "yes, sir."

3

During cross-examination, Mr. Lambert testified that he could not recall if he told the police that he went to Morgantown after the robbery/murder occurred. Further, defense counsel asked Mr. Lambert if he told the police that he was forced to go to Parkersburg after the crime occurred. He stated that he could not recall. When asked if he remembered telling Lt. Yost that Defendant Chapman never exited the car upon arriving at the victim's residence, Mr. Lambert stated that he could not recall. Defense counsel also asked Mr. Lambert about a prior statement he made to Lt. Yost in which he said that he did not have a gun during the robbery. Mr. Lambert stated that he did not recall making that statement.[3]

---

[3] Defendant Chapman argues that there were numerous inconsistencies between Mr. Lambert's prior statements and his trial testimony and states that these inconsistencies would have been critical to the jury's ability to assess Mr. Lambert's credibility. Defendant Chapman's brief sets forth these inconsistencies as follows:

> The jury was entitled to know that Lambert had previously stated that [Defendant Chapman] did not get out of the car at the scene, and that his prior statement omitted his assertion at trial that [Defendant Chapman] said something in secret to another of the actual perpetrators. The jury was entitled to know that Lambert had previously alleged that he had gone to Morgantown after the crime, and that Lambert had previously stated that he had been "forced" to go to Parkersburg after the crime by [Defendant Chapman]. The jury was entitled to know that Lambert had previously stated to the police that he was homeless at the time when he claimed at trial that he had a house in Bellview. The jury was entitled to hear that, contrary to Lambert's testimony at trial that the victim "handed" him the money and drugs after he was shot, his prior statement was that the drugs and money fell on the floor and he took some of the drugs out of the victim's pocket. The jury was entitled to hear that Lambert had previously stated that the shooters "just showed up" at the house. The jury was entitled to consider that, despite Lambert's admission of an extensive history of drug usage, including his ingesting Xanax and smoking crack cocaine and marihuana on the night of the robbery and being high before entering the [victim's] residence . . ., he made a prior statement relating the extent to which he consumed several drugs, both before and after the crime, which would be crucial to his memory and perception of events on the evening of November 17, 2016. Especially, when the Court ruled, over the objection of Defense Counsel, that Lambert could answer the question "Is your memory today free of those substances that you were using prior to turning yourself in," to which Lambert responded "Yes, sir." Certainly, the witness' ability to correctly perceive and remember events, and the jury's determination of the credibility of Lambert's perception and memories, would be affected by knowing that Lambert consumed a large quantity of drugs both before and after the robbery, rather

4

Defense counsel sought to play audio excerpts of Mr. Lambert's prior statements to demonstrate that certain answers he provided during the trial were inconsistent with prior statements he had made to the police. The circuit court called the attorneys to the bench and had the following exchange:

> Prosecutor: Your Honor, I think in order to play any of these excerpts there – and prove the prior inconsistent statement by extrinsic evidence, the witness would have to deny actually saying it, and I think in each occasion Mr. Lambert has indicated he does not recall saying it or he doesn't recall the facts that way. I don't think he's ever denied, no, I didn't say that. So I don't – I think it's an improper use of the recorded statements at this point.

> Defense Counsel: Excuse me, your Honor. First of all, it would be, number one, a prior inconsistent statement. If he does not recall making that statement, he has testified under oath to something different, it is in fact a prior inconsistent statement that we have the right to show.
> . . .

> Circuit Court: All right. . . . If, [defense counsel], you want to play excerpts to show a prior inconsistent statement, he does need to deny it, and then you can play that statement to indicate that. If, for some other reason – I'm not going to get into what might be or not be. I mean, if you need to refresh recollection, I don't know, but just to – if he says he doesn't know and you just want to pay a tape to show him what was said, that's not proper.

The circuit court revisited this issue near the end of Mr. Lambert's testimony. The circuit court repeated its earlier ruling, making it clear that defense counsel could not impeach Mr. Lambert with a prior inconsistent statement unless Mr. Lambert affirmatively denied making the statement. The circuit court provided:

> Here's my ruling, we're not going to do this again, we're going to move this trial on, if he says no, you can impeach him – or, I'm sorry, you can – yeah, you can play the inconsistent statement, which obviously has the effect of

than being able to consider that he just smoked "some weed" and "did a bit of coke."

5

impeaching him. If he doesn't remember, and you feel it's important for the jury to know what he said he doesn't remember and what he actually did say, you can get that in through other witnesses.

The State's next witness was Mr. Jarvis. Mr. Jarvis testified that he contacted Lt. Yost on the night the crime occurred with information about the formulation of the robbery plan. During his trial testimony, Mr. Jarvis stated that he got a call from Defendant Chapman and Mr. Lambert requesting that he join them to talk about "hittin' a lick." He explained that "hittin' a lick" means "to rob somebody." Mr. Jarvis subsequently met with Defendant Chapman, Mr. Lambert, and three others ("DeShawn, Chantel, and Jermaine") and they discussed robbing "Tone." Mr. Jarvis testified that "Tone" was related to the victim and stayed at the same apartment as the victim. Unbeknownst to Defendant Chapman and Mr. Lambert, Mr. Jarvis stated that Tone was a friend of his. Following this conversation, Mr. Jarvis called Tone and warned him about the possible robbery. Mr. Jarvis explained what happened on the night of the robbery as follows:

> When I got the call that somebody got shot, people was implicating me, that I had something to do with it. So I know how rumors get stirred up in Fairmont, so I automatically called to the station – I mean, I called Doug [Lt. Yost] and I said, look, man, people saying that I had something to do with it, you know, what's going on, and I told him that he could look at the cameras at the Avenue Motel, because I didn't leave my room that day.

Mr. Jarvis then met with Lt. Yost and gave him a recorded statement. During cross-examination, defense counsel asked Mr. Jarvis if he remembered telling Lt. Yost that Mr. Lambert was the one who brought up the robbery. Mr. Jarvis replied, "I don't know."[4]

_____

[4] Defendant Chapman's brief highlights a number of alleged inconsistencies between Mr. Jarvis's trial testimony and the prior statement he made to Lt. Yost:

> Jarvis testified on direct examination that he got a call from [Defendant Chapman] and Lambert wanting him to come to Benoni [Avenue] and talk to him about hitting a lick [i.e., carrying out a robbery], clearly contradictory to his clarification in the audio taped statement that it was Tim Lambert that called him over to the house and Tim Lambert that brought up the plan. Jarvis also testified at trial that he saw [Defendant Chapman], Lambert, [and others] at the house[,] contradicting his recorded interview statement that "it was really just me, Lambert, Twan and [Defendant Chapman]." Jarvis's trial testimony was he gave Tim Lambert and [Defendant Chapman] a ride to Spring Street and then "went to my son's mom's house" and, "Then I called

6

After the State called several other witnesses, defense counsel revisited the circuit court's ruling on the prior inconsistent statement issue. Defense counsel, citing Professor Cleckley's *Handbook on Evidence*,[5] asserted:

> Mr. Cleckley indicates that the witness denies – the ruling of the Court that I recall is that if Mr. Lambert denied making the statement, I could use it to impeach him, but he did not deny the statement, he indicated that he couldn't remember whether or not he said it. And, basically, Mr. Cleckley says if the witness denies making the inconsistent statement or state [sic] he does not remember whether he made it or refuses to testify as to whether he made it, extrinsic evidence may be introduced if the subject matter is relevant. And, of course, the relevancy of the statement is that it is a prior inconsistent statement under [the] rules of evidence and the witness is in fact present and testifying.

The circuit court took the matter under advisement. It later reiterated its earlier ruling, explaining:

> I do not believe that if he references a question, for example, you know, Mr. Witness did you tell Detective so and so something and repeat what it is, if the witness indicates I don't remember, that is not an appropriate use of that witness statement. It's a blurring of refreshing recollection and impeachment that's not appropriate, in this Court's opinion. And, quite frankly, even reading a little bit further into the authority that [defense counsel] was using from Cleckley, Cleckley reiterates that, as a matter of fact.

---

Tone, and I said these [expletive] trying to rob you." This testimony was inconsistent with his audio taped statement to Lt. Yost that he left the house on Benoni and, "I went straight there to Tony's." When Jarvis was cross-examined by defense counsel regarding his interview and his testimony at trial he stated, "I don't know" in response to whether he told Lt. Yost that Tim Lambert called him to the house on Benoni and "I could've" when questioned about his prior recorded statement that Tim Lambert [was] the person who brought up the robbery to him.

[5] *See* 1 Louis J. Palmer, Jr., Robin Jean Davis and Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 613.02 (6th ed. 2015).

I believe it is appropriate to use those recordings for impeachment if the witness does give a different answer. Again, I think that's consistent with what I indicated yesterday, and that's going to be the continued ruling of the Court with this witness or if you call any other witness.

Defense Counsel: Okay . . . but just please note our continuing objection and exception to that ruling[.]

At the conclusion of the trial, the jury found Defendant Chapman guilty on all four counts. On February 12, 2018, Defendant Chapman filed a motion for a new trial, asserting that the circuit court erred by not allowing him to use prior inconsistent statements to impeach Mr. Lambert and Mr. Jarvis. The circuit court denied this motion[6] and entered its sentencing order on April 4, 2018. The circuit court sentenced Defendant Chapman to one to five years on the conspiracy conviction; one to fifteen years on the burglary conviction; fifteen years on the robbery conviction, and a life with mercy sentence on the murder conviction. The circuit court ordered the burglary conviction to run consecutively to the conspiracy conviction, and the robbery and murder convictions to run concurrently with each other but consecutively to the burglary and conspiracy convictions. Defendant Chapman appeals the circuit court's order.

On appeal, the issue is whether the circuit court erred in preventing Defendant Chapman from cross-examining two witnesses with prior inconsistent statements. This Court set forth the applicable standard of review in *State v. Blake*, 197 W.Va. 700, 705, 478 S.E.2d 550, 555 (1996):

> A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are reviewed for an abuse of discretion. *See McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995). Even when a trial court has abused its discretion by admitting or excluding evidence, the conviction must be affirmed unless a defendant can meet his or her burden of demonstrating that substantial rights were affected by the error. *See State v. LaRock,* 196 W.Va. 294, 470 S.E.2d 613 (1996). In other words, a conviction should not be reversed if we conclude the error was harmless or "unimportant in relation to everything else the jury considered on the issue in question." *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432, 449 (1991). Instead, this Court will only overturn a conviction on evidentiary grounds if the error had a

---

[6] The circuit court's order denying Defendant Chapman's motion for a new trial was entered on April 16, 2018.

substantial influence over the jury.  This reasoning suggests that when the evidence of guilt is overwhelming and a defendant is allowed to put on a defense, even if not quite so complete a defense as he or she might reasonably desire, usually this Court will find the error harmless.  If, however, the error precludes or impairs the presentation of a defendant's best means of a defense, we will usually find the error had a substantial and injurious effect on the jury. When the harmlessness of the error is in grave doubt, relief must be granted. *O'Neal v. McAninch*, 513 U.S. 432, [438], 115 S.Ct. 992, 996, 130 L.Ed.2d 947, 955 (1995); *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

With these standards as guidance, we consider the parties' arguments.

Defendant Chapman asserts that the circuit court erred by prohibiting defense counsel from using prior statements "to impeach and discredit the witnesses' (Mr. Lambert and Mr. Jarvis) trial testimony and assist the jury in determining the witnesses' credibility."[7]  According to Defendant Chapman, Mr. Lambert's recorded statements made to the police, before and after his arrest, contained significant inconsistencies compared to his trial testimony.  These inconsistencies were important, especially considering Mr. Lambert's trial testimony that he was "truthful from the beginning."  Similarly, Defendant Chapman contends that Mr. Jarvis's testimony was inconsistent with his recorded statement to police, including the fact that he told the police that Mr. Lambert initially called him and informed him of the plan to rob the victim, despite his testimony at trial that Defendant Chapman and Mr. Lambert initially contacted him about the robbery.

The State agrees with Defendant Chapman that the circuit court abused its discretion by not permitting Defendant Chapman to use prior inconsistent statements to impeach Mr. Lambert and Mr. Jarvis.  The State's brief provides, "[a]fter long and serious consideration by the Office of the Attorney General, the Office of the Attorney General agrees that the circuit court abused its discretion in finding that [Defendant Chapman] was not entitled to cross-examine Lambert and Jarvis with their prior inconsistent statements. As such the Attorney General's Office confesses error on this point."  Additionally, the State concedes that the error was not harmless.

---

[7] Defendant Chapman raised two additional assignments of error in this appeal: 1) the circuit court erred by failing to preclude a State witness from testifying based on Defendant Chapman's contention that the witness was not disclosed in a timely fashion; and 2) the State failed to provide Defendant Chapman with "complete and prompt disclosure of discovery information."  Based on our conclusion that Defendant Chapman is entitled to a new trial based on the prior inconsistent statement assignment of error, it is unnecessary for us to address these additional assignments of error.

After review, we agree with Defendant Chapman and the State that the circuit court abused its discretion by prohibiting Defendant Chapman from using the prior statements of Mr. Lambert and Mr. Jarvis for impeachment purposes. The circuit court determined that impeachment with a prior inconsistent statement is only permitted upon a witness denying that he had made the prior statement. It ruled that Defendant Chapman could not impeach these witnesses with prior inconsistent statements if the witnesses could not recall making a particular statement. This ruling was erroneous.

This Court has held:

> 3. Where a witness testifies about events which are covered in a prior out-of-court statement and the witness denies making the out-of-court statement *or indicates no present recollection of its contents*, then impeachment by a prior statement is permissible.

> 4. Where the witness cannot recall the prior statement or denies making it, then under W.Va.R.Evid. 613(b), extrinsic evidence as to the out-of-court statement may be shown—that is, the out-of-court statement itself may be introduced or, if oral, through the third party to whom it was made. However, the impeached witness must be afforded an opportunity to explain the inconsistency.

Syl. Pts. 3 and 4, *State v. Schoolcraft*, 183 W. Va. 579, 396 S.E.2d 760 (1990) (Emphasis added).

Further, "[a] defendant . . . has the right to be accorded a full and fair opportunity to fully examine and cross-examine the witnesses." Syl. Pt. 1, in part, *State v. Crockett*, 164 W. Va. 435, 265 S.E.2d 268 (1979). "A criminal defendant has a broad right to impeach prosecution witnesses on cross-examination with prior inconsistent statements." *State v. Foster*, 171 W. Va. 479, 482, 300 S.E.2d 291, 294 (1983) (citations omitted). "A person in jeopardy of losing his liberty interest should be afforded, within the rules of evidence, the opportunity to challenge the State's evidence with his best means of defense." *State v. Scarbro*, 229 W. Va. 164, 170, 727 S.E.2d 840, 846 (2012).

We addressed the admission of a witness's prior inconsistent statement in syllabus point one of *Blake*, 197 W.Va. 700, 478 S.E.2d 550:

> Three requirements must be satisfied before admission at trial of a prior inconsistent statement allegedly made by a witness: (1) The statement actually must be inconsistent, but

10

there is no requirement that the statement be diametrically opposed; (2) if the statement comes in the form of extrinsic evidence as opposed to oral cross-examination of the witness to be impeached, the area of impeachment must pertain to a matter of sufficient relevancy and the explicit requirements of Rule 613(b) of the West Virginia Rules of Evidence—notice and an opportunity to explain or deny—must be met; and, finally, (3) the jury must be instructed that the evidence is admissible only to impeach the witness and not as evidence of a material fact.

Both the State and Defendant Chapman agree that the first requirement of *Blake* is met in this case. That is, Mr. Lambert and Mr. Jarvis' prior statements were actually inconsistent with portions of their trial testimony. Mr. Lambert's trial testimony included inconsistencies with the statements he had previously made to the police including whether Defendant Chapman got out of the car when it arrived at the victim's residence, where he went after the crime, whether he was forced to go to Parkersburg by Defendant Chapman, and his level of intoxication at the time of the crime.[8] Defendant Chapman asserts that the "most important aspect of all of Lambert's prior inconsistent statements is that they are critical to the jury's ability to assess Lambert's credibility and undermine Lambert's testimonial assertion at trial that he told the police the truth from the beginning." Similarly, there were inconsistencies between Mr. Jarvis's trial testimony and his earlier statement to the police.[9] Based on the foregoing, we find the first requirement of *Blake* has been met.

*Blake*'s second requirement provides that

[i]f the statement comes in the form of extrinsic evidence as opposed to oral cross-examination of the witness to be impeached, the area of impeachment must pertain to a matter of sufficient relevancy and the explicit requirements of Rule 613(b) of the West Virginia Rules of Evidence—notice and an opportunity to explain or deny—must be met[.]

Syl. Pt. 1, in part, *Blake*.

Mr. Lambert and Mr. Jarvis' prior statements to the police were relevant— they concerned Defendant Chapman's alleged role in the robbery/shooting. Also, we find

---

[8] *See* footnote 3.

[9] *See* footnote 4.

11

that there was notice and an opportunity for Mr. Lambert and Mr. Jarvis to explain or deny their prior statements. The witnesses were testifying at the time Defendant Chapman sought admission of the previous statements, and the witnesses would have had the opportunity to address the inconsistencies. Further, the State would have had the opportunity to question the witnesses on redirect regarding the inconsistent statements. Therefore, we find that the second requirement under *Blake* is met.

The final *Blake* requirement is that upon admission of a prior inconsistent statement of a witness, the circuit court should instruct the jury that the statement was admitted only for the purpose of impeachment and not as substantive evidence. Because the prior inconsistent statements were not admitted, this requirement is not relevant to our analysis.

In sum, we find that the *Blake* requirements for the admission of a prior inconsistent statement are satisfied. Therefore, we find that the circuit court's refusal to allow Defendant Chapman to cross-examine Mr. Lambert and Mr. Jarvis about their prior inconsistent statements constitutes error.

We also agree with the State and Defendant Chapman that this error was not harmless. The State explained its conclusion that the error was not harmless as follows:

> In the instant case, the State's chief witnesses against [Defendant Chapman] were Lambert and Jarvis. As testified to by Det. Yost, no physical evidence linked [Defendant Chapman] to the crime scene, no specific fingerprint or DNA evidence placed [Defendant Chapman] at [the victim's address], no videotape identified [Defendant Chapman] as an occupant of the Black Jimmy or any other vehicle involved in the crime, nor were [Defendant Chapman's] fingerprints on any item of the State's evidence.
>
> . . .
>
> Given the importance of the testimony from Lambert and Jarvis and the lack of physical evidence against [Defendant Chapman], the error in this case is not harmless. *See State v. Scarbro*, 229 W. Va. 164, 171, 727 S.E.2d 840, 847 (2012) ("Based on the importance of Mr. Reid's testimony and the less than overwhelming nature of evidence against the petitioner, this Court believes that the improper exclusion of Mr. Reid's prior inconsistent statement places the fairness of the petitioner's trial in doubt. Therefore, we conclude that the petitioner's conviction must be reversed and this case remanded for a new trial.").

12

We agree with the State's analysis. The credibility of these two witnesses was crucial to the State's case against Defendant Chapman, especially given the lack of physical evidence against Defendant Chapman. Therefore, we conclude that the circuit court's refusal to allow Defendant Chapman to cross-examine Mr. Lambert and Mr. Jarvis about their prior inconsistent statements cannot be considered harmless.

For the foregoing reasons, Defendant Chapman's convictions are reversed, and this matter is remanded to the circuit court for a new trial.

Reversed and Remanded.

**ISSUED:** April 24, 2020

**CONCURRED IN BY:**
Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison