No. 23-ICA-430 – *In re: Expungement of Record of N.B.*

SCARR, C. J., dissenting:

I respectfully dissent from the majority opinion because I do not believe that the short order entered by the circuit court was adequate to permit meaningful appellate review. Although the decision to grant or deny expungement is entrusted to the sound discretion of circuit courts, it is incumbent upon them to explain the basis for their decisions in sufficient detail to permit us to determine whether they considered and properly weighed all relevant factors and did not abuse their discretion.

In this case, the circuit court did not indicate in its order what weight, if any, it gave to a number of important factors, including, but not limited to, the circumstances of N.B.'s prior conviction for malicious wounding and subsequent rehabilitation; the fact that his criminal records as they now stand are inaccurate because they do not indicate that his conviction for second degree murder was vacated, that his *Alford* plea to voluntary manslaughter was withdrawn, and that all charges against him related to the death of Ms. Crawford were dropped; the fact that he has already been incarcerated for more than ten years for the death of Ms. Crawford; his repeated insistence that he was innocent; the impact of his unexpunged convictions on his social life, employment, educational, and housing opportunities; the weakness of the case against him, which was based on the questionable testimony of a co-defendant, but nevertheless resulted in his conviction for second-degree murder; the compelling nature of the DNA evidence, which inculpated a

1

violent sex offender who had been living in Huntington at the time of the murder, smoked the same kind of cigarette found at the scene of the crime, and allegedly told two of his ex-wives that he had killed someone; and the content and circumstances of certain statements by N.B. during parole hearings which allegedly implicated him in the death of Ms. Crawford.

The cursory nature of the circuit court's order is especially troublesome given that its language was copied practically verbatim from the respondent's brief in opposition to expungement, and the fact that no hearing was held regarding expungement which might have shed light on the evidence considered by the circuit court and its legal analysis.

## I. Background

On August 8, 2002, Deanna Crawford's body was found in a wooded area of Cabell County, West Virginia. When she was found, she was naked from the waist down, with her pants next to her body. She had clearly been murdered in a very violent manner,[1] but N.B. was neither a suspect nor a person of interest. Police collected DNA from several objects found at the crime scene, including Ms. Crawford's pants, beer and snuff cans, and

---

[1] "Ms. Crawford's right hyoid bone was fractured with extensive laceration of the right hyoid cartilage. Accordingly, the cause of Ms. Crawford's death was determined to be manual strangulation. Numerous contusions and abrasions were found on her lower extremities. There was also blood found on the leopard print pants [found adjacent to her body] and Ms. Crawford's left hand." *Dement v. Pszczolkowski*, 245 W. Va. 564, 567, 859 S.E.2d 732, 735 (2021).

several cigarette butts. The initial investigation focused on a deceased suspect who was cleared by the police department prior to his death,[2] and the case went cold for close to four and a half years, during which N.B. was never a person of interest.

In January 2007, however, Brian Dement's uncle, "who was known to law enforcement and had previous convictions," *State v. Barnett*, 226 W. Va 422, 425 n.3, 701 S.E.2d 460, 463 n. 3 (2010) (per curiam), surreptitiously recorded a conversation in which Dement implicated himself and three friends, J.B., P.B., and N.B., in the murder of Ms. Crawford. Dement's uncle then "presented this recording to law enforcement." *Id.* at 425, 701 S.E.2d at 463.[3] In his later interview with N.B.'s private investigator, Dement claimed that he had been "strung out on drugs" when he talked to his uncle.[4] After Dement's recorded conversation with his uncle was given to law enforcement, Dement was repeatedly questioned by the state police, and provided several inconsistent versions of his

---

[2] "The original suspect died in 2003, but Trooper Cummings testified that this person had already been excluded by the police department during its investigation." *State v. Black,* 227 W. Va. 297, 302 n.2, 708 S.E.2d 491, 496 n. 2 (2010); *see also State v. Barnett*, 226 W. Va. 422, 425, 701 S.E.2d 460, 463 (2010) (per curiam) ("One of the original suspects upon whom the investigation focused died, and the investigation remained stalled.")

[3] During his interview with N.B.'s private investigator, Dement speculated that his uncle was "[p]roably trying to get out of trouble himself, because he stayed in trouble a little bit."

[4] During this interview, Dement also claimed that his statements about being at a party with N.B. prior to the murder of Ms. Crawford "was all rehearsed and made up." When asked about statements that he had gone for a ride with his co-defendants and the victim, that she had been dragged out of the car, that she had been hit and kicked, and that someone said, "Let's get the bitch," he replied that none of that had happened.

story to police and attorneys, and under oath in the criminal trials of J.B., P.B., and N.B. Dement attempted to recant his statements, both before and after the criminal trials, saying that he had been suffering from mental conditions and under the influence of drugs when he gave his incriminating statements.[5] He also alleged that when he had been interrogated by the police, he had been questioned and badgered for several hours, despite telling them that he was under the influence of Xanax.

N.B. was convicted of second-degree murder in 2008, solely on the basis of Dement's testimony which was offered pursuant to a plea agreement with the state.[6] There was never any physical evidence linking N.B. or any of his co-defendants to the murder of Ms. Crawford. When the DNA samples collected in 2002 were analyzed in 2007, they did not match the DNA of N.B. or any of his co-defendants. Following his conviction, N.B. was sentenced to forty years in the state penitentiary.

N.B. appealed, and the Supreme Court of Appeals of West Virginia ("SCAWV") vacated his conviction on July 13, 2010, because N.B.'s attorney was not

---

[5] The psychological assessment done in Dement's own criminal case was revealing: "He admitted having 'a problem with [X]anax, cannabis, and opiates[.]' His abuse of alcohol, sedatives, amphetamines, and hallucinogens led to a heart attack at age 24 in 2005. The assessment also noted that Mr. Dement had been diagnosed with bipolar disorder. Mr. Dement denied any involvement in Ms. Crawford's murder." *Dement v. Pszczolkowski*, 245 W. Va. 564, 569, 859 S.E.2d 732, 737 (2021).

[6] "Dement was the State's sole witness to testify at trial who could place [N.B.] at Ms. Crawford's murder." *State v. Barnett*, 226 W. Va. 422, 430, 701 S.E.2d 460, 468 (2010) (per curiam).

4

allowed to introduce the prior inconsistent statements of the state's key witness, Mr. Dement, including audio recordings of statements he gave, which was clearly prejudicial. *See State v. Barnett*, 226 W. Va. 422, 701 S.E.2d 460 (2010) (per curiam). After his case was remanded to the trial court, N.B. entered an *Alford* plea[7] for voluntary manslaughter, accepting the consequences of committing this crime while continuing to maintain his innocence. Having already served two years in the state penitentiary, N.B. had ample reason to avoid being retried for murder and possibly spending the rest of his life in prison even if he did not commit the crime with which he had been charged. N.B. was sentenced to fifteen years for involuntary manslaughter.

In 2017, one of N.B.'s co-defendants was able to have new DNA testing done on evidence collected from the scene of the crime. Once again, none of this DNA testing matched any of the defendants (including N.B.) charged with the murder of Ms. Crawford. But this time, however, the DNA from the crime scene was found to match the DNA of Timothy Smith, a violent, convicted sex offender incarcerated in Ohio on unrelated charges, who had been living in Huntington, West Virginia at the time of the murder. Mr.

---

[7] *Alford* pleas allow a criminal defendant to plead guilty while maintaining his or her innocence. *See State ex rel. W. Va. Dept. of Health and Hum. Res. v. Fox*, 218 W. Va. 397, 400 n.4, 624 S.E.2d 834, 837 n.4 (2005) (per curiam). The plea takes its name from *North Carolina v. Alford*, 400 U.S. 25 (1970) which held that courts could accept such pleas. In West Virginia, *Alford* pleas are also known as *Kennedy* pleas or *Alford/Kennedy* pleas because they were recognized in Syl. Pt. 1 of *Kennedy v. Frazier*, 178 W. Va. 10, 357 S.E.2d 43 (1987). *Alford* pleas allow a defendant to "consent to the imposition of a prison sentence even though he is unwilling to admit participation in the crime" in order "to avoid the possibility of a significantly higher penalty" if the case proceeds to trial. *Id*. at 12, 357 S.E.2d at 45.

Smith's DNA was found on a cigarette butt recovered at the crime scene,[8] and more significantly, in seminal fluid and epithelial (skin) cells from inside the crotch of the victim's pants. When questioned by the West Virginia State Police about why his DNA might have been found at the scene of Ms. Crawford's murder, he was unable to offer an explanation.[9] Although denying that he had killed Ms. Crawford, he admitted that he had employed the services of sex workers in the past and might have had sex with Ms. Crawford, although he said that he could not remember her. The DNA testing done in 2017 identified DNA from a single source, Timothy Smith.

Based on this new DNA evidence, N.B. was allowed to withdraw his *Alford* plea on the grounds of "manifest injustice" by the same judge who later denied his plea for expungement. The prosecuting attorney subsequently dropped the charges against N.B. as part of a plea deal with Brian Dement. On February 10, 2023, N.B. filed a petition to expunge the criminal records pertaining to his convictions for second-degree murder and voluntary manslaughter because of their adverse impact on his social life, employment and

---

[8] Mr. Smith's DNA was found on a Basic cigarette butt. During a deposition taken on April 19, 2019, he testified that he smoked Basic cigarettes.

[9] In a subsequent deposition taken in April 2019, Smith speculated that Ms. Crawford might have been to his house at some point (although he still professed that he did not remember her) and stolen a used cigarette she took to the crime scene, and that she might have performed oral sex on him in exchange for pills and spat his ejaculate inside her pants. *Dement v. Pszczolkowski*, 245 W. Va. 564, 571, 859 S.E.2d 732, 739 (2021). During the same deposition, he admitted that he did not know how his ejaculate would have gotten on the inside crotch of the victim's pants (because prostitutes did not take their pants off when they were performing oral sex on him) or why DNA from the victim's saliva would not have been on the cigarette butt along with his. Deposition at 104 & 105.

housing opportunities. Because he had previously been convicted of a felony, he was unable to seek relief under any of the expungement statutes and instead invoked the court's inherent equitable powers to expunge criminal records where extraordinary circumstances are shown. Without holding a hearing or requesting proposed findings of fact and conclusions of law or proposed orders from the parties, the circuit court entered a short four-page order denying N.B.'s petition for expungement which adopted practically verbatim the language of the state's brief in opposition to expungement.[10]

At oral argument,[11] the parties acknowledged the obvious fact that N.B.'s unexpunged charges for second-degree murder and voluntary manslaughter are inaccurate insofar as they indicate that he has existing convictions for both crimes, and misleading

---

[10] In addition to using virtually identical language, the circuit court did some other things which suggest that it might have merely copied respondent's opposition to expungement. In its opposition to expungement, respondent alleged, without citation, that: "Public policy is set by the legislature and not by the Courts." This language was incorporated into the circuit court's order, again without citation, even though courts, as well as the Legislature, help to define public policy, and the WVSCA has decided cases based on public policy imperatives derived from common law and judicial decisions. *See Cordle v. Gen. Hugh Mercer Corp.*, 174 W. Va. 321, 325-27, 325 S.E.2d 111, 114-17 (1984). The respondent wrote in its opposition to expungement that "the **State** does not believe that the Petitioner has met his burden. While the **State** does not disagree with the procedural history as set out by the Petitioner, it does not share the Petitioner's analysis of the facts underlying that procedural history." (Emphasis added). When the circuit court incorporated these sentences into its order, it did not bother to change "State" to "Court."

[11] This appeal was argued on the campus of Davis & Elkins College in Elkins, West Virginia, on September 17, 2024. Sydney McGinnis, a third-year student at the West Virginia University College of Law, ably argued the case on behalf of N.B. I would like to thank Davis & Elkins College for hosting our oral arguments that day, and to commend counsel, including Ms. McGinnis, for the quality of their presentations.

insofar as they do not indicate that both offenses involved the same victim. Unless this record is corrected or expunged, N.B., now only forty-one years of age, will face the adverse consequences of these charges for the rest of his life.

## II. Our Role as an Appellate Court

In addressing the adequacy of the circuit court's order, it is important to consider our role as an appellate court in somewhat more detail than the majority has done. A circuit court's order denying expungement of criminal records is reviewed for an abuse of discretion. Syl. Pt. 1, *In re A.N.T.*, 238 W. Va. 701, 798 S.E.2d 623 (2017). "[A]n abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed but the circuit court makes a serious mistake in weighing them." *Wal-Mart Stores East, L.P. v. Ankrom*, 244 W. Va. 437, 454, 854 S.E.2d 257, 274 (2020) (quoting *Gentry v. Mangum*, 195 W. Va. 512, 520 n.6, 466 S.E.2d 171, 179 n. 6 (1995)). Put simply, a trial court "abuses its discretion if its ruling is based on an erroneous assessment of the evidence or the law." *Bartles v. Hinkle*, 196 W. Va. 381, 389, 472 S.E.2d 827, 835 (1996) (citing *Cox v. State*, 194 W. Va. 210, 218 n.3, 460 S.E.2d 25, 33 n.3 (1995) (Cleckley, J., concurring)). Even when a circuit court's order is supported by some evidence in the record, we may reverse

when we are convinced that it has ignored evidence, considered evidence not properly before it, or made a serious mistake in weighing the evidence.[12]

In fulfilling our appellate function, we need to know what the circuit court has considered, and how it has weighed and analyzed the relevant facts and law. The usual standards that factual findings will be reviewed under a clearly erroneous standard, conclusions of law de novo, and ultimate dispositions for abuse of discretion contemplate sufficient findings of fact and conclusions of law to facilitate a meaningful review. *See generally Nestor v. Bruce Hardwood Flooring, L.P.,* 206 W. Va. 453, 456, 525 S.E.2d 334, 337 (1999) ("[O]ur task as an appellate court is to determine whether the circuit court's reasons for its order are supported by the record. This task is impossible without sufficient factual and legal findings."); *Mullins v. Mullins*, 226 W. Va. 656, 662, 704 S.E.2d 656, 662 (2010) (per curiam).

### III. Discussion

**A. The Circuit Court Order**

N.B. filed a petition on February 10, 2023, to expunge his conviction of second-degree murder and his *Alford* plea for voluntary manslaughter, both of which

---

[12] I part company with the majority because I believe it went out of its way to affirm the circuit court, selectively identifying facts which supported the circuit court's decision while ignoring other facts that cut against it and gave the circuit court's ruling a deference that was unjustified given the cursory nature of the circuit court's order.

involved the death of Ms. Crawford. On August 21, 2023, without holding a hearing, the circuit court issued an order denying expungement which adopted the opposition filed by the state almost verbatim.[13] Although adopting verbatim the findings of fact and conclusions of law prepared by a party is not grounds for reversal per se, it is not the preferred practice, as the appellate courts of this state have recognized on several occasions. *See, e.g., State ex rel. Cooper v. Caperton*, 196 W. Va. 208, 214, 470 S.E.2d 162, 168 (1996); *Witteried v. City of Charles Town*, No. 17-0310, 2018 WL 2175820, at*5 n.4 (W. Va. May 11, 2018) (memorandum decision); *Jonpaul C. v. Heather C.*, 248 W. Va. 687, 694, 889 S.E.2d 769, 776 (Ct. App. 2023). The SCAWV has cautioned circuit courts "that the burden of issuing an order which meets this Court's requirements, which requirements are designed to permit meaningful review, ultimately remains on the circuit court." *Taylor v. W. Va. Dept. of Health & Hum. Res.*, 237 W. Va. 549, 558, 788 S.E.2d 295, 304 (2016).

Although this case involves language taken from a party's brief, rather than a proposed order, the concerns about adopting language verbatim remain, and, if anything, are even more significant. Briefs are written to be persuasive, rather than objective, and when a party submits a proposed order, the other side usually has an opportunity to respond at length and submit its own proposed order or findings of fact and conclusions of law. When a court adopts the findings and conclusions of a party, whether it be from a brief or

---

[13] Apart from its opening and closing paragraphs, the four-page order issued by the circuit court uses language virtually identical to the language of respondent's opposition to expungement.

a proposed order, it is often more difficult to determine what the court has reviewed and whether it has conducted an independent analysis of the facts and law, especially when there has been no hearing where evidence and law have been presented and discussed and the court may have stated its rulings on the record. In the present case, the circuit court issued an order adopting the language of a party's brief which understandably presented the facts and arguments in a way favoring the respondent while giving short shrift to the evidence and arguments in favor of expungement. As the Supreme Court observed in *United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 656 (1964), opinions "drawn with the insight of a disinterested mind are… more helpful to the appellate court."

## B. Presumed Familiarity with Evidence

Given the limited findings of fact and legal reasoning contained in the order under review, the majority relies on a presumed familiarity with the facts supposedly resulting from the circuit judge's prior involvement in the case. However, the judge did not preside over N.B.'s trial; and did not become involved in N.B.'s criminal proceedings until after N.B.'s jury conviction for second-degree murder had been overturned on appeal.[14] If the circuit court relied on information from sources other than the expungement pleadings, it did not indicate that in its order denying expungement, making it very difficult to assess

---

[14] N.B.'s trial for second-degree murder was conducted by the Honorable John L. Cummings. Judge Cummings, rather than the circuit judge, also conducted the trials of N.B.'s three co-defendants, including Mr. Dement.

the factual basis for its ruling or whether it abused its discretion.[15] Although the judge had some exposure to N.B.'s criminal case prior to the filing of N.B.'s petition for expungement, we can only speculate as to what the judge may have remembered from the criminal case, how accurately and completely he remembered it, what he considered, and how much weight it may have been given in his deliberations. Part of our job as an appellate court is to determine whether the lower court's findings are supported by material, competent, and substantial evidence. *See Robinson v. Coppala*, 212 W. Va. 632, 634, 575 S.E.2d 242, 244 (2002). Expungement rulings lacking evidentiary support constitute an abuse of discretion because they are "based on an erroneous assessment of the evidence." *In re I.S.A.*, 244 W. Va. 162, 169, 852 S.E.2d 229, 236 (2020). If a circuit court does not identify what evidence it reviewed or what information it relied on, it seriously impairs our ability to review its decision for abuse of discretion.

## C. The Case Against N.B.-- Dement's Testimony

Despite the very physical and violent nature of the crime, there was never any physical evidence linking N.B. or any of his co-defendants to the scene of the crime. DNA samples taken from the crime scene did not match N.B. or any of his co-defendants. N.B. was convicted of second-degree murder based on the testimony of Brian Dement, a co-defendant who attempted to recant his testimony on numerous occasions, both before

---

[15] It is also difficult for a party to respond to undisclosed information the court may have relied on outside of the pleadings and record.

and after his trial testimony.[16] This testimony was suspect at best given that the co-defendant claimed he was suffering from mental issues and under the influence of multiple drugs when he confessed to police and implicated N.B. in the murder of Ms. Crawford. Prior to appearing at trial, Mr. Dement gave three inconsistent statements to the police. *See State v. Barnett*, 226 W. Va. 422, 425, 701 S.E.2d 460, 463 (2010) (per curiam) ("In a questioning session that lasted approximately nine hours, Dement signed two statements detailing the murder of Ms. Crawford. A third statement was tape-recorded by law enforcement. Each statement contained facts inconsistent with other versions."). Mr. Dement testified against N.B. pursuant to a plea agreement with the state, which arguably might have some effect on his credibility. *See generally State ex rel. Yeager v. Trent*, 203 W. Va. 716, 510 S.E.2d 790 (1998) (per curiam) (remanding for new trial where the state

---

[16] "Days after Mr. Dement pled guilty, he gave a recorded statement to [N.B.'s] private investigator indicating that he had lied to the police during his initial statements. Specifically, Mr. Dement stated that 'we all are innocent' and that he wanted to 'go against [his] statement,' but his lawyers and the court would not allow him to do so." *Dement v. Pszczolkowski,* 245 W. Va. 564, 569-70, 859 S.E.2d 732, 737-38 (2021). "On March 12, 2018, Mr. Dement once again recanted his previous confession during an interview with a private investigator. The private investigator informed Mr. Dement about the recent DNA results, and Mr. Dement responded that he was not surprised because the confessions he made to law enforcement were made while he was under the influence, and he had been there for 'hours and hours.' Mr. Dement asserted to the private investigator that he had told law enforcement that he was 'high on Xanaxes.' When the private investigator asked Mr. Dement about the previously taped confessions to his uncle, Mr. Bailey, Mr. Dement replied, 'I remember hearing tapes that I got from the discovery—the tapes, and it was all blurred. I mean, I didn't make no sense at all, because I was just—I was strung out on drugs[.]' Additionally, on several occasions throughout the interview with the private investigator, Mr. Dement explained that he had tried to take back his previous admissions/confessions; however, the prosecuting attorney told him that they were all going to be convicted because the statements were written, and Mr. Dement could face a longer sentence". *Id*. at 571; 859 S.E.2d at 739.

did not disclose plea agreement which could have been used for purposes of impeachment).
In 2008, after a jury found him guilty of second-degree murder, N.B. was sentenced to forty
years in the penitentiary with credit for time served.

### D. Parole Hearing Statements

The majority notes that the circuit court relied in part on statements that N.B.
allegedly made during his second and third parole hearings, indicating that he had been
"involved" in the murder of Ms. Crawford, although he blamed Brian Dement for her death.
Significantly, these statements are not part of our record on appeal, so we cannot judge how
probative they might be. N.B.'s counsel challenged the admissibility of these statements in
the lower court in connection with his criminal proceedings, but the issue of their
admissibility was never determined because the charges against N.B. were dismissed.[17]

It is not clear whether N.B.'s parole statements were ever submitted to, or
reviewed by, the circuit court in connection with N.B.'s expungement proceedings.[18] N.B.'s

---

[17] Regardless of admissibility, we should recognize that parole hearing statements
may be influenced by an inmate's desire to obtain release; the possibly coercive nature of
such proceedings; and whether he has the benefit of counsel. Thus, even if N.B.'s
statements would be admissible, it would still be necessary to determine what weight they
should be given in expungement hearings, assuming that they were submitted to the circuit
court.

[18] It is possible that the circuit court may have listened to one or more of N.B.'s
parole hearing statements prior to the October 5, 2021, dismissal hearing where charges
were dropped against N.B. and his co-defendants. During that hearing, when the statements
given by the four co-defendants were mentioned by the prosecution, the judge indicated

petition for expungement did not mention them. The state's brief in opposition to expungement mentioned them but did not indicate that they were attached as exhibits. Similarly, the docket sheet for the circuit court does not indicate that there were any exhibits to the state's opposition, although it does reflect that there were unidentified exhibits to N.B.'s petition for expungement.[19] N.B.'s initial brief on appeal states that there was no evidentiary support for the circuit court's statement concerning the parole statements allegedly made by N.B., and that the circuit court simply "took the state at its word" when it adopted the language of the state's opposition concerning those parole statements. The Respondent's appellate brief argues that the parole statements would have been admissible at trial but does not say whether they were submitted to the circuit court.

---

that he had "listened to **some** of the tapes they gave" (emphasis added) but did not identify which or whose tapes he reviewed. If he reviewed any of N.B.'s recorded parole statements, his order under review in this appeal does not so indicate. Nor does it say whether he might have reviewed the statement(s) in connection with the expungement proceedings at issue here. I note that the circuit court's order denying expungement was issued two and a half years after the criminal cases were dismissed, ample time to forget details or confuse this matter with other criminal cases. We should not have to speculate as to what the circuit court reviewed, remembered, or relied on, what weight it might have assigned to various evidence, or how much time elapsed between reviewing that evidence and issuing its order. *See generally King v. King*, 363 So.3d 1099, 1101 (Fla. Ct. App. 2023) (per curiam) (some of the factors to consider when reviewing a verbatim order to determine whether the court has exercised its own independent judgment are "how much time has passed since the hearing, and does the judge remember the case?", "Did the judge participate in the trial?", and "Did the judge edit or alter the proposed judgment to conform it to his or her own conclusions about the case, or did he or she sign it verbatim?").

[19] According to Respondent's appellate brief, however, it is not clear whether N.B. included any attachments to his petition for expungement, which adds to the confusion on appeal concerning what was reviewed, let alone relied on, by the circuit court.

N.B. attended at least three parole hearings. Respondent asserted in its opposition to expungement that N.B. "admitted he was involved in her death in his first and third parole hearings" and this language was adopted verbatim in the circuit court's order. N.B. contends, however, that he maintained his innocence during the first parole hearing, but that no transcript or audio recording of that proceeding was preserved. There is no indication in the circuit court's order or other parts of the record as to whether N.B.'s parole statements were consistent, whether he was represented by counsel at the parole hearings, whether he was told that his statements might be used against him in other proceedings, or whether he might have been told that parole would not be granted if he did not accept responsibility for his crime. If a hearing had been held in this case, the parties could have explored how much weight, if any, should have been given to N.B.'s statements. In his briefs on appeal, N.B. states he should have been allowed an opportunity in an evidentiary hearing to discuss statements allegedly made during parole hearings and why he made them.

### E. J.B.'s Statement to the Police

The majority relies in part on statements made to the state police by J.B., a co-defendant, which allegedly implicated N.B. in the murder of Ms. Crawford. This reliance is misplaced for several reasons. First, these statements were not provided to the circuit court during N.B.'s expungement proceedings. Second, the parties did not mention these statements in the pleadings presented to the circuit court in the expungement

16

proceedings. Third, the circuit court did not mention these statements in its order denying expungement. Fourth, even if the circuit court had relied on these statements in denying expungement, it would have been necessary for the circuit court to assess and weigh their probative value, but its order contains no analysis relative to the statements by J.B. Like the statements by Dement, they were recanted, and there were circumstances which detracted from their credibility.[20] Fifth, the record does not clearly indicate whether these statements were ever presented to, or reviewed by, the circuit court in other proceedings or when that might have occurred. We do know, however, that the circuit judge did not preside

---

[20] "Mr. Black recanted his statement [to the police] one week later, alleging he had been coerced into providing details that had been supplied to him by law enforcement officials and that, in actuality, he had no knowledge of the crime or victim in question." *State v. Black*, 227 W. Va. 297, 302, 708 S.E.2d 491, 496 (2010).

> At his trial and in contradiction to his original statement provided to the police, Mr. Black testified that he did not know the victim, Deanna Crawford; that she was never at a party at his house; and that Brian Dement was never at a party at his house. Mr. Black testified that he had no involvement with any events that resulted in Deanna Crawford's death. Furthermore, he testified at trial that his previous statement to the police, wherein he admitted driving a car with the victim and the three other men from a party at his house, was provided to the police as a result of the police feeding him details of the crime and threatening to revoke his parole if he refused to tell them what they wanted to hear.

*Id.* at 303, 708 S.E.2d at 497 (footnotes omitted). At a suppression hearing held in connection with his criminal trial, J.B. "testified that he was induced or coerced into repeating information that was provided to him by officers, and that he did so in return for being allowed to go home and prevent revocation of his parole." *Id.* at 305, 708 S.E.2d at 499. J.B.'s allegation that he was given details of the crime by the police is interesting because J.B. was questioned shortly after Dement.

17

over the trial of J.B., which was presided over by Judge Cummings. Finally, these statements were not included in our record on appeal.

## F. The Newly Discovered DNA Evidence

The circuit court opined that the DNA evidence did not "exonerate" N.B. because it could not completely rule out that he had been present and involved at the murder. One might quibble as to what "exonerate" means in the context of a criminal prosecution involving DNA evidence implicating someone other than the accused, *see Black v. W. Va. State Police*, No. 3:22-0096, 2023 WL 2667754 at *1 (S.D. W. Va. March 28, 2023) (referring to the "exoneration" of one of N.B.'s co-defendants for the murder of Ms. Crawford based on DNA evidence), but "exoneration" is not the test that should be applied in expungement proceedings.[21] Rather, courts should consider whether the evidence casts doubt on the validity of an arrest, charge, or conviction. *See In re A.N.T.*, 238 W. Va. 701, 705, 798 S.E.2d 623, 627 (2017) ("A majority of jurisdictions find 'extraordinary circumstances' [justifying expungement] only if the facts underlying the petitioner's criminal records were truly unusual or extreme, so as to cast doubt on the validity of his/her arrest, charge, or conviction.").

---

[21] I agree with the majority that the DNA evidence in this case did not "completely" foreclose the possibility of N.B.'s involvement in the murder of Ms. Crawford. When N.B.'s convictions for second-degree murder and voluntary manslaughter were set aside, that did not establish that he was innocent, but he once again enjoyed a presumption of innocence.

That was certainly the case here, where there was never any physical evidence connecting N.B. with the murder of Ms. Crawford, the testimony which led to N.B.'s conviction was suspect at best, and recanted on multiple occasions, and the DNA evidence not only implicated someone other than N.B., but someone who was quite likely to have committed the murder. The record indicates that Smith was a violent sex offender who was living in Huntington, West Virginia at the time of the murder, frequently consorted with sex workers, and smoked the same kind of cigarette found at the scene of the crime. According to two of his ex-wives, he physically abused them, and told them that he had killed someone.[22] *Dement v. Pszczolkowski*, 245 W. Va. 564, 571, 859 S.E.2d 732, 739 (2021). One wife described Smith as having been "extremely violent" with her. *Id*. When questioned by the West Virginia State Police, he was unable to explain how his DNA had wound up in seminal fluid and skin cells found in the crotch of Ms. Crawford's pants or on the butt of a cigarette found near her body.

The DNA evidence in this case was significant and compelling, as the state acknowledged in its brief on appeal. *See* Respondent's Brief at 16 (If N.B. were retried, the DNA evidence would result in a "not guilty" verdict), at 22 (if the State attempted to try

---

[22] "Mrs. Craft …stated that less than a week before she saw television news reports of Ms. Crawford's death, Mr. Smith came home with blood on his hands and in possession of money with blood on it. When Mrs. Craft inquired about the blood, Mr. Smith responded by saying "something about hitting someone and killing them." *Dement v. Pszczolkowski*, 245 W. Va. at 571, 859 S.E.2d at 739. "Mrs. Ford recalled an incident where Mr. Smith threatened to kill her 'like he had killed a prostitute.' Mr. Smith told her that 'he had hit [a prostitute] over the head and that [his cousin] Jerry Lee Perry strangled the victim.' They then 'hid her body in the hills.'" *Id*.

Smith or N.B., "each would be able to effectively point the finger at the other to establish reasonable doubt"), at 16 ("The DNA evidence… while not dispositive… is admittedly exculpatory"). "[L]aw enforcement, the defense bar, and the courts have acknowledged DNA testing's 'unparalleled ability both to exonerate the wrongly convicted and to identify the guilty.'" *State ex rel. DeChristopher v. Gaujot*, 244 W. Va. 631, 645, 856 S.E.2d 223, 237 (2021) (quoting *Maryland v. King*, 569 U.S. at 442). Although the SCAWV has not discussed whether newly discovered exculpatory evidence can constitute "extraordinary circumstances" for purposes of expungement, it has held that newly discovered evidence can provide "extraordinary circumstances" justifying a new trial. *See State ex rel. Smith v. Sims*, 240 W. Va. 601, 814 S.E.2d 264 (2018) (testimony by surviving victim that someone other than defendant fired the shots that hit victim and killed a second victim).

Part of what makes the DNA evidence in this case so compelling is that it connects someone with the crime who was very likely to have committed it. It is not clear from the order whether the circuit court considered all of the evidence which made Timothy Smith a likely perpetrator of the crime. If it did, it is not clear what weight it gave to the DNA evidence compared to the questionable testimony of Dement. In its order, repeating language from the state's brief in opposition to expungement, the circuit court declared that "at best, it [the DNA evidence] gives him an alternative theory," but the court did not discuss the relative strength or probability of those theories. In fact, I am unable to determine from the circuit court's order and the record on appeal whether the circuit court ever examined the DNA test results and the other evidence, such as the statements by his

ex-wives, potentially linking Timothy Smith to the murder of Ms. Crawford. The record suggests that it did not. [23]

The majority opinion, in stating that the DNA evidence was not "a complete exoneration" of N.B., implies that the mere possibility that N.B. might be guilty under some theory, no matter how weak, absolutely precludes expungement. I am not suggesting that this court should weigh the evidence, but I do believe that the circuit court should do so and provide an adequate order for us to know what it considered, and how it analyzed the evidence in reaching its conclusion. The majority properly notes the deference that should be given to circuit courts and their discretion, but that deference assumes that we have an adequate order and record to review and evaluate the circuit court's rulings. This court has never hesitated to remand matters to circuit courts when an order was inadequate

---

[23] When the circuit court denied Dement's petition for habeas corpus, it refused to hear any evidence concerning the DNA test results, the deposition testimony of Mr. Smith, testimony from three of Mr. Smith's ex-wives and his brother, or expert testimony concerning false confessions, because it had already made up its mind that Dement was guilty. The judge informed defense counsel:

> Here is what I am going to do for you because I don't think you have a leg to stand on. … I am going to let you vouch the record with whatever witness you had here and what you feel like they would testify to, and then I am going to throw you out of court. … I don't think [Dement] has a claim.

*Dement v. Pszczolkowski,* 245 W. Va. 564, 572, 859 S.E.2d 732, 740 (2021). The circuit court was reversed on appeal precisely because it refused to hold an evidentiary hearing. When the circuit court later held a hearing to dismiss the charges against N.B. and his co-defendants, it mentioned various things it had reviewed, but it did not mention the DNA test results or the information allegedly available concerning Mr. Smith.

to permit meaningful appellate review and this case should be no exception to what our general practice has been.

## G. Impact of Unexpunged Charges

N.B. was incarcerated for more than ten years for the murder of Deanna Crawford before both of his convictions were set aside and the charges against him were dropped. Beyond the time lost to incarceration and his emotional distress, N.B. continues to suffer negative consequences stemming from his unexpunged and uncorrected convictions. Specifically, N.B. has struggled to find employment as criminal background checks run by prospective employers continue to show not only information about his arrest, but that he was convicted of second-degree murder and voluntary manslaughter and sentenced for each, without indicating that these were convictions stemming from the same incident. The criminal records submitted as part of the record also indicate that N.B. is still on parole and will be until July 26, 2026. In addition to adverse effects on his employment, he argues that he may have trouble procuring housing in the future.[24]

Incredibly, the circuit court opined that the "adverse effects upon [N.B.]" from the present charges were "virtually nonexistent" given his prior "conviction for malicious wounding, which is not subject to expungement." No explanation was given for

---

[24] At the time when N.B. filed his petition for expungement, he was living in housing owned by his family, thereby temporarily avoiding the possibility of rejection by prospective landlords, but he anticipated the difficulties he might encounter if he were forced to move for any reason.

22

this startling conclusion, which is not self-evident by any means. A criminal record of convictions for second-degree murder and voluntary manslaughter would almost certainly have serious implications for N.B.'s social, educational, employment, and housing opportunities. *See* Valena E. Beety, Judge Michael Aloi, Evan Johns, *Emergence from Civil Death: The Evolution of Expungement in West Virginia*, 117 W. Va. L. Rev. Online 63, 70–71 (May 19, 2015) ("Even a *nolo contendere* plea to a misdemeanor will saddle an individual with ... collateral consequences. These consequences permeate nearly every aspect of an offender's life: education, recreation, housing, travel, and domestic life.") (footnotes omitted); *see generally In re Petition of D.K. for Expungement of Record*, 248 W. Va. 699, 889 S.E.2d 781 (2023) (Scarr, J., dissenting) (discussing collateral consequences of unexpunged criminal convictions.)

The fact that N.B. was previously convicted of malicious wounding when he was young would not necessarily render harmless these additional charges for second-degree murder and voluntary manslaughter. N.B.'s conviction for malicious wounding during a fight was more than sixteen years ago, when he was only nineteen, and following this conviction, he was released from the Anthony Correctional Center after successfully completing a seven-month program of training and rehabilitation. Many potential employers and landlords might perceive his conviction for second-degree murder and his *Alford* plea for voluntary manslaughter as much more serious than a youthful conviction for malicious wounding.

Moreover, including both murder and manslaughter convictions on his record makes it appear that he was a repeat offender, especially when the records provided for our review do not indicate that the charges for murder and manslaughter, both of which were set aside, stem from the same death. One might read the records as they currently exist and erroneously conclude that N.B. had been convicted of three separate violent crimes, two of which involved the death of another human being, and that he had not been successfully rehabilitated following his youthful conviction for malicious wounding. One might also glean from the criminal records that N.B. was still on parole and would be until July 26, 2026. The parties agreed during oral argument that the criminal records relating to the murder of Ms. Crawford are inaccurate to the extent that they indicate that N.B. has outstanding convictions for second-degree murder and voluntary manslaughter, and misleading to the extent that they do not show that these convictions, now set aside, related to the same incident.

There is no evidence in the record that N.B. ever experienced any difficulty in obtaining employment or housing because of his conviction for malicious wounding, or that he experienced any such difficulty prior to his conviction for second-degree murder and his *Alford* plea for voluntary manslaughter. Nor did the circuit court cite any evidence to support its conclusion that the charges related to the murder of Ms. Crawford would not adversely affect N.B. In fact, in his appellate briefs, N.B. stated that the circuit court should have heard evidence concerning the effect of the unexpunged criminal records relating to the murder of Ms. Crawford.

## H. Prior Youthful Conviction for Malicious Wounding

In its order, the circuit court relied in part on N.B.'s prior conviction for malicious wounding in 2002 when he was only nineteen. Although this conviction was relevant[25] in determining whether to grant the petition for expungement, *see In re the Petition of Krein for Expungement of Records*, No. 13-0694, 2014 WL 1672945 (W. Va. April 25, 2014) (memorandum decision) (denying petition for expungement based on twenty-five "serious" misdemeanor charges), the circuit court should have considered and discussed the facts surrounding this conviction and N.B.'s subsequent rehabilitation.

When N.B. was convicted of malicious wounding, his sentence of two to ten years in the state penitentiary was suspended, and he was committed to the Anthony Correctional Center for a period of six months to two years, pursuant to the Youthful Adult Offender Act, W. Va. Code § 25-4-1 (1999). This program is reserved for young, first-time

---

[25] Respondent originally argued that the existence of a prior felony conviction was not just relevant but dispositive. According to respondent, our general expungement statute established a public policy that precluded expungement when there was a prior conviction. Although W. Va. Code § 61-11-25 (2012) would not allow expungement where there was a prior felony conviction, that limitation was restricted to petitions for expungement filed "pursuant to this section." Further undercutting respondent's argument that there was a firm public policy against expungement when there were prior felony convictions was the fact that other expungement statutes contained no such limitation. *See* W. Va. Code § 5-1-16a (2009) (expungement following unconditional pardon); W. Va. Code § 15-2C-5 (1996) (expungement of registry listings of abuse, neglect or misappropriation of property); W. Va. Code 60A-4-407 (2002) (conditional discharge for first offense of possession); W. Va. Code 61-14-9 (2021) (expungement of convictions or juvenile delinquency adjudications of sex trafficking victims). At oral argument, respondent admitted that the existence of a prior felony conviction was not an absolute bar to expungement when relief was sought pursuant to the inherent powers of courts.

offenders, giving them an opportunity at "reformation and encouragement of self-discipline." During his time at the Anthony Correctional Center, N.B. completed individualized and group training for improvement in the Life Skills Program, Anger Control Classes, Crime Victim Awareness Classes, and completed 400 work hours while receiving a Welding Technology Certificate. After seven months at the Anthony Correctional Center, N.B. was deemed sufficiently reformed and placed on probation for a period of one year after the warden of the facility issued a letter of recommendation. In his appellate briefs, N.B. contends that he should have been given an opportunity to present evidence concerning the circumstances of his youthful conviction for malicious wounding and subsequent rehabilitation.

## IV.  Conclusion

Because the order entered by the circuit court was insufficient to permit meaningful appellate review, it should be vacated and remanded for reconsideration, more detailed analysis, and more complete findings of fact and conclusions of law. *See In re J.J.C.*, No. 19-0868, 2020 WL 6482744 (W. Va. Nov. 4, 2020) (memorandum decision). If necessary, an evidentiary hearing should be held to develop the facts. *See In re ISA*, 244 W. Va. at 169, 852 S.E.2d at 236 (remanding expungement case for factual development).

For these reasons, I respectfully dissent.

26